No. 108,526

CARLENE M. CRAIG, LEO RITTENHOUSE, JEFF BRAMLAGE, LAWRENCE LIABLE, and KENT WHISTLER, *Appellants*, v. FEDEX GROUND PACKAGE SYSTEM, INCORPORATED, *Appellee*.

(335 P.3d 66)

Opinion filed October 3, 2014.

*Steve Six*, of Stueve Siegel Hanson LLP, of Kansas City, Missouri, argued the cause, and *Beth A. Ross* and *Sandy N. Nathan*, of Leonard Carder, LLP, of Oakland, California, *Robert I. Harwood* and *Matthew M. Houston*, of Harwood Feffer, LLP, of New York, New York, *Susan E. Ellingstad*, of Lockridge Grindal Nauen P.L.L.P., of Minneapolis, Minnesota, and *George A. Barton* and *Stacy A. Burrows*, of The Law Offices of George A. Barton, P.C., of Kansas City, Missouri, were with him on the briefs for appellants.

*James D. Oliver*, of Foulston Siefkin LLP, of Overland Park, argued the cause, and *Jonathan D. Hacker*, of O'Melveny & Myers LLP, of Washington, D.C., *Robert M. Schwartz*, of O'Melveny & Myers LLP, of Los Angeles, California, and *J. Timothy Eaton*, of Shefsky & Froelich Ltd., of Chicago, Illinois, were with him on the brief for appellee.

*Greg L. Musil* and *Amy E. Morgan*, of Polsinelli PC, of Overland Park, *James C. Sullivan*, of Kansas City, Missouri, and *Richard Pianka*, of ATA Litigation Center, of Arlington, Virginia, were on the brief for *amici curiae* American Trucking Associations, Inc. and Kansas Motor Carrier Association.

*Justin McFarland*, deputy general counsel, of Kansas Department of Labor, was on the brief for *amicus curiae* Lana Gordon, State of Kansas Secretary of Labor.

The opinion of the court was delivered by

*Per Curiam*: The United States Court of Appeals for the Seventh Circuit requests our answers to two certified questions regarding

the proper classification of FedEx Ground Package System, Inc. (FedEx) delivery drivers under the provisions of the Kansas Wage Payment Act (KWPA), K.S.A. 44-313 *et seq*. Specifically, the Seventh Circuit inquires:

"1. Given the undisputed facts presented to the district court in this case, are the plaintiff drivers employees of FedEx as a matter of law under the KWPA?

"2. Drivers can acquire more than one service area from FedEx. . . . Is the answer to the preceding question different for plaintiff drivers who have more than one service area?" *Craig v. FedEx Ground Package System, Inc.*, 686 F.3d 423, 431 (7th Cir. 2012).

We answer yes to the first certified question. As applied to those drivers who are members of the certified class, *i.e.*, those drivers who " 'drive a vehicle on a full-time basis,' " we answer no to the second question, *i.e.*, the answer to the first question remains the same. See 686 F.3d at 425, n.1.

### FACTS AND PROCEDURAL OVERVIEW

This case began as numerous class actions filed throughout the country against FedEx by current and former drivers for the company. The plaintiff drivers allege they are employees, rather than independent contractors, under both state and federal law. The Judicial Panel on Multidistrict Litigation consolidated the class actions, transferred the consolidated action to the United States District Court for the Northern District of Indiana (District Court), and designated the Kansas class action as the lead case.

The District Court certified a nationwide class seeking relief under the Employee Retirement Income Security Act (ERISA) and certified statewide classes under Federal Rule of Civil Procedure 23(b)(3). *Craig*, 686 F.3d at 425. There are 479 Kansas class plaintiffs who allege that they were improperly classified as independent contractors under the KWPA. They seek repayment of all costs and expenses that they expended on behalf of FedEx during their time as FedEx drivers, and they claim entitlement to unpaid overtime wages. The Kansas class is defined as follows:

" 'All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement . . . ; 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment

absences) from February 11, 1998, through October 15, 2007, to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Kansas.' [Citation omitted.]" *Craig*, 686 F.3d at 425, n.1.

Pursuant to this class definition, plaintiffs must be full-time drivers. Accordingly, we will also refer to plaintiffs as "drivers."

All parties filed cross-motions for summary judgment on a stipulated record that included a form Operating Agreement (OA) entered into between FedEx and the drivers, as well as evidence relating to certain FedEx work practices. The District Court determined that the Kansas class plaintiffs were independent contractors under the KWPA. Consequently, the court granted summary judgment to FedEx and denied the Kansas class plaintiffs' summary judgment motion. 686 F.3d at 425. Subsequently, the District Court relied on its decision in the Kansas *Craig* case to enter summary judgment in favor of FedEx on the respective plaintiffs' employment status challenges in all the other statewide class actions. See *In re FedEx Ground Package System, Inc.*, 758 F. Supp. 2d 638 (N.D. Ind. 2010).

All state class plaintiffs appealed, presenting substantially the same issue: Whether the district court erred by deciding, as a matter of law, that plaintiffs were independent contractors, rather than employees, under each respective state's substantive law. The Seventh Circuit chose to proceed with review of the *Craig* appeal while suspending briefing in the remaining appeals.

The Seventh Circuit began its analysis by noting that under Kansas law the " 'right of control' test is the most important consideration in determining whether an employment relationship exists, but it is not the only one." *Craig*, 686 F.3d at 427. Ultimately, the Seventh Circuit opined that our Kansas cases addressing the right to control test did not clearly indicate to the Seventh Circuit how it should decide a close case, such as the one presented by the facts of this case. The Seventh Circuit explained its need to propound certified questions to this court as follows:

"Where some of the factors weigh in favor of finding employee status, some weigh in favor of independent contractor status, and some 'cut both ways,' a court must weigh the factors according to some legal principle or principles. But other than

the point that the right of control is the primary factor, what is the underlying principle (or principles) that guides that weighing process in close cases such as this seeking to establish an employment relationship under the KWPA? We are unsure." 686 F.3d at 428.

A lengthy recitation of the uncontroverted facts relied upon by the federal courts is set forth in the District Court's opinion. *In re FedEx Ground Package System, Inc.*, 734 F. Supp. 2d 557, 560-75 (N.D. 2010). Although we have carefully reviewed all of the recited facts, we will not repeat the entire recitation here but rather we will refer to the relevant facts as they become germane to our discussion.

### FedEx Delivery Drivers' Status under the KWPA

The simple question is whether FedEx's delivery drivers are employees for purposes of the KWPA. The answer defies such simplicity. As FedEx's counsel acknowledged at oral argument, the company carefully structured its drivers' operating agreements so that it could label the drivers as independent contractors in order to gain a competitive advantage, *i.e.*, to avoid the additional costs associated with employees. In other words, this is a close case by design, not happenstance. Notwithstanding the form or labels utilized, we must determine whether the substance of the relationship between FedEx and its delivery drivers renders the drivers employees within the meaning of the KWPA. Ultimately, we determine that form does not trump the substantive indicia of an employer/employee relationship.

### Authority/Standard of Review

K.S.A. 60-3201, entitled "Power to answer," provides us with the authority to respond to the Seventh Circuit's request. That statute provides, in relevant part:

"The Kansas supreme court may answer questions of law certified to it by . . . a court of appeals of the United States, . . . when requested by the certifying court if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court and the court of appeals of this state." K.S.A. 60-3201.

By statutory definition, certified questions present questions of law, and we exercise unlimited review over such questions. See *Nationwide Mutual Ins. Co. v. Briggs*, 298 Kan. 873, 875, 317 P.3d 770 (2014); *Eastman v. Coffeyville Resources Refining & Marketing*, 295 Kan. 470, 473, 284 P.3d 1049 (2012).

Moreover, with these particular certified questions, we must interpret and apply the KWPA, which is also a question of law subject to de novo review. See *Salon Enterprises, Inc. v. Langford*, 29 Kan. App. 2d 268, 270-71, 31 P.3d 290 (2000).

*Overview of the KWPA*

We begin by reviewing the applicable statutory provisions. The KWPA is an "expansive and comprehensive legislative scheme that is broad in its scope and the rights created for Kansas workers to secure unpaid wages earned from their labors." *Campbell v. Husky Hogs*, 292 Kan. 225, 233, 255 P.3d 1 (2011). It was enacted in 1973 and primarily sought to address problems being encountered by employees of small businesses. See An Act Providing for Wage Payment and Collection: Hearing on H.B. 1429 Before the Senate Comm. on Public Health and Welfare, 1973 Leg., 68th Sess. (Kan. 1973) (statement of Rep. Jim Parrish, Member, House of Representatives). The KWPA's primary concern was to protect low income workers who were shorted, docked, or cheated out of pay for services performed. See An Act Providing for Wage Payment and Collection: Hearing on H.B. 1429 Before the House Comm. on Labor and Industry, 1973 Leg., 68th Sess. (Kan. 1973) (statement of T. McCune, Kansas Department of Labor). A goal of the legislation was to protect Kansas employees who were not then covered by the Fair Labor Standards Act (FLSA), minimum wage requirements, or the National Labor Relations Board. (McCune Statement, p. 1).

The KWPA controls several aspects of wages and benefits for the Kansas worker that are not covered by the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 (2012) *et seq.* The KWPA governs when wages must be paid, the manner in which they must be paid, and the circumstances in which wages can be withheld. See K.S.A. 2007 Supp. 44-314; K.S.A. 2007 Supp. 44-319. The

KWPA also requires employers to provide certain notice requirements with respect to the payment of wages and the provision of benefits. See K.S.A. 2007 Supp. 44-319a; K.S.A. 44-320. It provides for remedies and penalties for violation of its requirements. K.S.A. 44-322; K.S.A. 2007 Supp. 44-322a. Notably, the KWPA does not contain any express provision relating to the payment of overtime, which is typically pursued under a FLSA claim.

Getting to the crux of the presented questions, the KWPA applies to "employees," defined as "any person allowed or permitted to work by an employer." K.S.A. 2007 Supp. 44-313(b). Independent contractors are specifically excluded from the definition of employee under the KWPA: " 'Allowed or permitted to work,' within the meaning of K.S.A. 44-313(b), shall not include an independent contractor, as defined by rules, regulations, and interpretations of the United States secretary of labor for the purposes of the fair labor standards act." K.A.R. 49-20-1(e) (Kansas regulation promulgated for the purpose of administering and enforcing provisions of the KWPA).

*Test for Determining Employment Status under the KWPA*

As the Seventh Circuit discovered, this court has not specifically identified a test that will definitively determine employment status under the KWPA. In *Herr v. Heiman*, 75 F.3d 1509, 1512 (10th Cir. 1996), the Tenth Circuit cited to a Kansas employment security law case—*Crawford v. Kansas Dept. of Human Resources*, 17 Kan. App. 2d 707, 845 P.2d 703 (1989), *rev. denied* 246 Kan. 766 (1990)—to discern the proper test for determining employment status under the KWPA. The *Herr* panel identified 20 factors that had been used in *Crawford* to consider when determining whether an employer/employee relationship exists. The panel noted that these factors were to be considered as a whole, with "particular emphasis placed on the employer's right to control the worker." *Herr*, 75 F.3d at 1512. These 20 factors were also considered in *Hartford Underwriters Ins. Co. v. Kansas Dept. of Human Resources*, 272 Kan. 265, 271, 32 P.3d 1146 (2001), a workers compensation case wherein we found an employer/employee relationship existed under the right to control test.

Neither *Crawford* nor *Hartford* identified the genesis of the 20-factor test, and neither opinion engaged in an individual discussion of each factor, which might explain why some of the factor descriptions appear to be inscrutably duplicative, *e.g.*, "19) whether the employer has the right to discharge the worker; and 20) whether the employer has the right to terminate the worker." *Hartford*, 272 Kan. at 271. An earlier source for a nearly identical 20-factor test is a 1987 Internal Revenue Service (IRS) revenue ruling, Rev. Rul. 87-41, 1987-1 C.B. 296, which discussed how to determine employment status under Section 530(d) of the Revenue Act of 1978. The description of each factor set forth in that revenue ruling eliminates any suggestion of duplication and provides clarification as to how to apply each factor. Accordingly, we will amend the *Crawford* factors to eliminate the ambiguous or duplicative descriptions and will hereafter refer to them as the 20-factor test.

But Kansas courts have long emphasized the right to control test when determining a worker's status.

"The primary test used by the courts in determining whether an employer-employee relationship exists is whether the employer has the right of control and supervision over the work of the alleged employee, and the right to direct the manner in which the work is to be performed, as well as the result which is to be accomplished." *Jones v. City of Dodge City*, 194 Kan. 777, 780, 402 P.2d 108 (1965).

We have utilized this test in cases involving the Kansas Employment Security Act, Workers Compensation Act, and negligence based on respondeat superior. See *Wallis v. Secretary of Kans. Dept. of Human Resources*, 236 Kan. 97, 102-03, 689 P.2d 787 (1984) (unemployment taxes); *Knoble v. National Carriers, Inc.*, 212 Kan. 331, 332-33, 510 P.2d 1274 (1973) (workers compensation); *Aspelin v. Mounkes*, 206 Kan. 132, 135-37, 476 P.2d 620 (1970) (respondeat superior).

In *Coma Corporation v. Kansas Dept. of Labor*, 283 Kan. 625, 644, 154 P.3d 1080 (2007), while determining that the KWPA applied to an undocumented worker, this court observed that the "definition of employee in the workers compensation statute is virtually identical to the definition of employee in the wage payment statutes." That definitional identity would seem to counsel in favor

of simply utilizing our workers compensation cases to inform our determination of "employees" under the KWPA. But a potential impediment to a direct correlation is found in our administrative regulations, specifically, K.A.R. 49-20-1(e). Granted, that regulation is not binding on this court. See *In re Tax Appeal of Chief Industries, Inc.*, 255 Kan. 640, 650, 875 P.2d 278 (1994) ("Administrative regulations do not supplant statutory law[,] nor do they preempt judicial statutory construction."). Nevertheless, the absence of binding effect does not entirely remove an administrative regulation from the de novo interpretation of a statute, especially given that the authority to promulgate regulations emanates from a statute.

K.S.A. 44-325 authorizes the Kansas Secretary of Labor to adopt rules and regulations necessary to administer and enforce the provisions of the KWPA. In response to that authority, the Kansas Secretary of Labor promulgated K.A.R. 49-20-1, which defines specific terms utilized in the KWPA. K.A.R. 49-20-1(e) pertains to the term " '[a]llowed or permitted to work' " and, as noted above, the regulation specifies that the term "shall not include an independent contractor, *as defined by rules, regulations, and interpretations of the United States secretary of labor for the purposes of the fair labor standards act.*" (Emphasis added.) In other words, our department of labor has deferred to the United States Department of Labor's definition of an independent contractor.

The FLSA defines an employee as "any individual employed by an employer" and "employ" is defined as "to suffer or permit to work." 29 U.S.C. § 203(e)(1) and (g) (2012). The principal congressional purpose in enacting the FLSA was to protect all covered workers from substandard wages and oppressive working hours. *Barrentine v. Arkansas-Best Freight System*, 450 U.S. 728, 739, 101 S. Ct. 1437, 67 L. Ed. 2d 641 (1981). The definition of employee under the FLSA was intended to make the scope of employee coverage under the FLSA very broad. *Johns v. Stewart*, 57 F.3d 1544, 1557 (10th Cir. 1995). However, similar to the KWPA, independent contractors cannot maintain a claim under the FLSA. *Johnson v. Unified Government of Wyandotte*, 371 F.3d 723, 727-28 (10th Cir. 2004).

Although there are no relevant federal regulations defining "independent contractor" for purposes of the FLSA, courts have considered the economic realities of the employment relationship when determining whether the individual is an employee or independent contractor under the FLSA. *Johnson*, 371 F.3d at 729; see *Lumry v. State*, 49 Kan. App. 2d 276, 286, 307 P.3d 232 (2013). "The 'economic realties' test seeks to look past technical, common-law concepts of the master and servant relationship to determine whether, as a matter of economic reality, a worker is dependent on a given employer." *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 506 (10th Cir. 2012). The economic reality test focuses on whether the worker is economically dependent on the business to which he or she renders service or whether the worker, as a matter of economic fact, is in business for himself or herself. *Baker v. Flint Engineering & Const. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998); *Doty v. Elias*, 733 F.2d 720, 722-23 (10th Cir. 1984).

In applying the economic reality test, courts generally look at the following factors:

"(1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the work is an integral part of the alleged employer's business." *Barlow*, 703 F.3d at 506.

The test also considers "whether the alleged employer has the power to hire and fire employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records." *Baker*, 137 F.3d at 1440. None of the individual factors are dispositive; instead, the court must employ a totality of the circumstances approach. *Barlow*, 703 F.3d at 506 (citing *Baker*, 137 F.3d at 1440).

Several of these economic reality factors are considered under the Kansas common-law right to control test for determining a worker's status. See, *e.g.*, *McCubbin v. Walker*, 256 Kan. 276, 281, 886 P.2d 790 (1994) (length of contract, independent nature of business, and method of payment); *Wallis*, 236 Kan. at 106 (right to discharge, furnishing equipment, and method of payment). In

addition, all but one component of the economic reality test—the degree of skill— are included within the 20-factor test, which we restate here as follows:

(1) the employer's right to require compliance with instructions (economic reality test's degree of control factor);

(2) the extent of any training provided by the employer;

(3) the degree of integration of the worker's services into the business of the employer (economic reality test's integral part of employer's business factor);

(4) the requirement that the services be provided personally by the worker;

(5) the extent to which the worker hires, supervises, and pays assistants;

(6) the existence of a continuing relationship between the worker and the employer (economic reality test's permanence of the working relationship factor);

(7) the employer's establishment of set work hours;

(8) the requirement that the worker devote full-time to the employer's business;

(9) the degree to which the work is performed on the employer's premises;

(10) the degree to which the employer sets the order and sequence of work;

(11) the requirement that the worker submit regular or written reports to the employer;

(12) the manner of payment to the worker, *e.g.*, by the hour, day, or job;

(13) the extent to which the employer pays the worker's business or travel expenses;

(14) the degree to which the employer furnishes tools, equipment, and material (economic reality test's investment in business factor);

(15) the incurrence of significant investment by the worker (economic reality test's investment in business factor);

(16) the ability of the worker to make a profit or suffer a loss (economic reality test's opportunity for profit or loss factor);

(17) whether the worker can work for more than one firm at a time;

(18) whether the worker makes his or her services available to the general public on a regular and consistent basis;

(19) whether the employer has the right to discharge the worker; and

(20) whether the worker has the right to terminate the relationship at any time without incurring liability.

The primary distinction between the right to control test and the economic reality test is that under the latter, the right to control is not considered the single most important factor in determining the worker's status. *Slayman v. FedEx Ground Package System, Inc.*, No. 12-35525, 2014 WL 421422, at *11 (9th Cir. 2014); *Herr*, 75 F.3d at 1512. Given the KWPA's purpose and plain language, the regulations promulgated to govern the administration of the KWPA, and our long-standing adherence to the right to control

test in determining employer/employee relationships, we discern that the 20-factor test as restated above is the tool to be used in Kansas to determine whether an employer/employee relationship exists under the KWPA. This test includes economic reality considerations, while maintaining the primary focus on an employer's right to control.

The District Court in this case primarily focused on the OA's statements of FedEx's right to control the drivers, opining that the actual control that FedEx exercised over the drivers was not the question. *In re FedEx*, 734 F. Supp. 2d at 560. But we consider the manner in which FedEx implemented the OA to be a compelling factor in determining the substantive question of the company's right to control its drivers.

## Are Plaintiff Drivers Employees under the KWPA?

Although the Seventh Circuit expressed some uncertainty as to the underlying principle(s) that should guide the decision in a close case regarding the applicability of the KWPA, it actually asks this court to make that close-call decision based upon the undisputed facts presented to the district court. Before embarking upon an analysis of the 20 factors, we pause to take a historical look at how we have previously characterized the employment status of truck drivers under other circumstances and to take a look at how other jurisdictions have decided the status of FedEx drivers.

## Kansas Precedent Classifying Truck Drivers

In most of the Kansas cases involving a worker who owned and operated a truck that was used extensively in a company's business, especially in workers compensation cases, the courts have classified the owner/operator truck driver as an employee rather than an independent contractor. See *Anderson v. Kinsley Sand & Gravel, Inc.*, 221 Kan. 191, 198-99, 558 P.2d 146 (1976) (workers compensation case finding employer/employee relationship based on fact that driver's work was inherent part of employer's business, employer often selected route for driver to take, employer determined kind and quantity of material to be delivered as well as delivery destination); *Knoble*, 212 Kan. at 334-37 (workers com-

pensation case finding existence of employer/employee relationship because employer told driver what materials to deliver, employer told driver where and when to deliver materials, employer required driver to call in two times a day, employer placed restrictions on driver's use of truck, and employer furnished driver with company identification card); *Watson v. Dickey Clay Mfg. Co.*, 202 Kan. 366, 377, 450 P.2d 10 (1969) (workers compensation case finding employer/employee relationship because employer provided materials to be delivered, employer told driver when and where truck was to be loaded, employer required truck to be clean, employer instructed on where materials were to be delivered, employer instructed driver on time of destination, and employer required driver to unload materials in accordance with client's demands); *Wilbeck v. Grain Belt Transportation Co.*, 181 Kan. 512, 513, 313 P.2d 725 (1957) (workers compensation case finding employer/employee relationship where driver could refuse to take a load but could not pick or choose what loads to take, and where employer used check-out procedure before driver could leave); *Dobson v. Baxter Chat Co.*, 148 Kan. 750, 85 P.2d 1 (1938) (respondeat superior case finding employer/employee relationship where company had right to control manner in which work was done); *Shay v. Hill*, 133 Kan. 157, 160-64, 299 P. 263 (1931) (workers compensation case holding that delivery driver was employee where driver worked full time performing integral part of company's business, driver had no say over what hauls he picked up, and employer instructed driver on how to pick up haul); *Baker v. Petroleum Co.*, 111 Kan. 555, 560, 207 P. 789 (1922) (respondeat superior case holding that driver was employee where company had "general charge of the truck and driver, was authorized to direct generally the character and kind of work to be done, and had full and complete control of the operations of the work it might direct to be done by the truck and driver").

Nevertheless, we have precedent in respondeat superior cases holding that a delivery driver was an independent contractor, rather than an employee, based on the company's lack of control over the driver's performance. See *Christensen v. Builders Sand Co.*, 180 Kan. 761, 763-65, 308 P.2d 69 (1957) (drivers chose their

own jobs and routes, drivers kept no regular hours, company exercised no control over how deliveries were to be conducted, and company and had no expectations of how many deliveries any particular driver would .make); *Sims v. Dietrich*, 155 Kan. 310, 313, 124 P.2d 507 (1942) (driver performed work that was not an integral part of company's business, company only told driver where to deliver posts, and company provided no instruction on route to take or time of delivery); *Brownrigg v. Allvine Dairy Co.*, 137 Kan. 209, 210-12, 19 P.2d 474 (1933) (contracting dairy company sold milk to distributor for cash on daily basis and had no further say or control over what distributor did with milk). But it does not appear that applying the 20-factor test will create any inconsistencies with the manner in which this court has decided these cases in the past.

### Other Jurisdictions' Analyses of FedEx Drivers

Other jurisdictions considering the status of FedEx drivers have reached different results. Two jurisdictions—the United States District Court for the Eastern District of Missouri and the California State Court of Appeals—determined that the FedEx drivers are employees. *Wells v. FedEx Ground Package System, Inc.*, 979 F. Supp. 2d 1006, 1024 (E.D. Mo. 2013); *Estrada v. FedEx Ground Package System, Inc.*, 154 Cal. App. 4th 1, 9, 64 Cal. Rptr. 3d 327 (2007). In both *Wells* and *Estrada*, FedEx drivers brought suit against FedEx claiming they were misclassified as independent contractors and seeking reimbursement for business expenses and back pay for overtime.

Both *Wells* and *Estrada* applied common-law right to control tests. *Wells* declared Missouri's concept of the right to control to be " 'more intricate . . . than most other states,' [citation omitted]," and listed the factors as:

"(1) the extent of control, (2) the actual exercise of control, (3) the duration of the employment, (4) the right to discharge, (5) the method of payment, (6) the degree to which the alleged employer furnished equipment, (7) the extent to which the work is the regular business of the employer, and (8) the employment contract." 979 F. Supp. 2d at 1014.

*Estrada* noted that because the California Labor Code does not expressly define "employee," the common-law test of employment applies, the essence of which is the " 'control of details'—that is, whether the principal has the right to control the manner and means by which the worker accomplishes the work." 154 Cal. App. 4th at 10. But the court noted that there were

"a number of additional factors in the modern equation, including (1) whether the worker is engaged in a distinct occupation or business, (2) whether, considering the kind of occupation and locality, the work is usually done under the principal's direction or by a specialist without supervision, (3) the skill required, (4) whether the principal or worker supplies the instrumentalities, tools, and place of work, (5) the length of time for which the services are to be performed, (6) the method of payment, whether by time or by job, (7) whether the work is part of the principal's regular business, and (8) whether the parties believe they are creating an employer-employee relationship." 154 Cal. App. 4th at 10.

In *Wells*, the court found that FedEx had the right to control and did control the means and manner of the drivers' work to such an extent that the drivers were employees and not independent contractors. 979 F. Supp. 2d at 1024. The court found the following facts supported a finding of right to control: FedEx's requirements with regard to vehicles, uniforms, and personal appearance; FedEx's right to determine the drivers' "Primary Service Areas"; FedEx's right to determine the services drivers must provide to FedEx customers; FedEx's right to determine the prices charged for the services; FedEx's right to determine the customer service standards that drivers must meet; FedEx's right to determine some time parameters for providing services to customers; FedEx's right to determine the days drivers must deliver packages; FedEx's right to require drivers to deliver all packages assigned to them that day on a 9- to 11-hour work day; and FedEx's right to conduct customer service rides to verify that the drivers were meeting standards of customer service required in the OA. 979 F. Supp. 2d at 1024-25.

In addition to the right to control and actual control factors, the *Wells* court also found the remaining six factors weighed in favor of employee status. With regard to "duration of employment," the court found that drivers had long-term relationships with FedEx, indicating that drivers were not hired by the job. 979 F. Supp. 2d

at 1025. Next, the court determined that the drivers could "effectively be terminated at will given that the OA provides for nonrenewal without cause." 979 F. Supp. 2d at 1025. The court determined the method of payment favored employee status because drivers were paid weekly, based on nonnegotiable factors. 979 F. Supp. 2d at 1025. The court acknowledged that drivers had to pay for their own equipment but found this factor still weighed in favor of employee status because FedEx "was intricately involved in the purchasing process, providing options for leasing and/or financing." 979 F. Supp. 2d at 1025. The court found that the drivers' work was the essence of FedEx's business and that even though the OA evidenced an intent for drivers to be considered independent contractors, the contractual designation was not conclusive where the evidence overcame such a designation. 979 F. Supp. 2d at 1021-22, 1025. Lastly, the court acknowledged that while drivers could "sell" their routes to approved drivers, they did not "own" the routes because customer accounts were based on contracts between FedEx and its customers. FedEx exercised complete control over any ability to solicit additional customers, and FedEx had control to unilaterally change the size and configuration of a driver's route at any time without the driver's approval. 979 F. Supp. 2d at 1025.

In *Estrada*, the court rejected FedEx's argument that the OA language giving drivers the sole authority to determine the "manner and means" of performing their job indicated that FedEx did not have the right to control, finding that "the evidence shows unequivocally that FedEx's conduct spoke louder than its words." 154 Cal. App. 4th at 11. Similarly, the court rejected FedEx's argument that it could not terminate drivers at will. "Although the Operating Agreement provides for termination with cause, it also provides for nonrenewal without any cause at all—and substantial evidence established that FedEx discharges drivers at will." 154 Cal. App. 4th at 11. Lastly, the court found that substantial competent evidence supported the trial court's findings with regard to FedEx's right to control the drivers. Specifically, the court determined the following facts established that drivers were employees based on FedEx's right to control:

"The drivers must wear uniforms and use specific scanners and forms, all obtained from FedEx and marked with FedEx's logo. The larger items—trucks and scanners—are obtained from FedEx-approved providers, usually financed through FedEx, and repaid through deductions from the drivers' weekly checks. Many standard employee benefits are provided, and the drivers work full time, with regular schedules and regular routes. The terminal managers are the drivers' immediate supervisors and can unilaterally reconfigure the drivers' routes without regard to the drivers' resulting loss of income. The customers are FedEx's customers, not the drivers' customers. FedEx has discretion to reject a driver's helper, temporary replacement, or proposed assignee." 154 Cal. App. 4th at 12.

The court also determined the following driver characteristics indicated an employer/employee relationship: Drivers were not required to possess any special skills, they were required to report to FedEx terminals at certain times for sorting and packing and could not leave the terminal until the process was complete, they did not engage in a separate profession, they had to work exclusively for FedEx, they had limited opportunity for profit that could be lost at the discretion of FedEx managers through "flexing" and withholding approval for additional drivers, and most drivers had worked for FedEx for a long time. 154 Cal. App. 4th at 12. In sum, the court found the drivers "look like FedEx employees, act like FedEx employees, are paid like FedEx employees, and receive many employee benefits. . . . [I]f it looks like a duck, walks like a duck, swims like a duck, and quacks like a duck, it is a duck." 154 Cal. App. 4th at 9.

On the flip side of the coin, two jurisdictions have determined that FedEx drivers are independent contractors, albeit one of those determinations was reversed on appeal. In *FedEx Home Delivery v. N.L.R.B.*, 563 F.3d 492 (D.C. Cir. 2009), FedEx appealed the National Labor Relations Board's (NLRB) determination that FedEx committed an unfair labor practice in violation of the National Labor Relations Act (NLRA) by refusing to recognize a union organized by drivers. The appeals court held that the NLRA was not applicable because FedEx drivers were independent contractors pursuant to a common-law test of agency. 563 F.3d at 504.

The *FedEx Home Delivery* court opined that when factors cut both ways, the governing principle was whether the position presented opportunities and risks inherent in entrepreneurialism. 563

F.3d at 497. The court concluded that the following indicia of entrepreneurial opportunity indicated that the drivers were independent contractors: driver's ability to operate multiple routes, driver's right to hire additional driver and helpers and sell routes *without permission*, and the parties' intent as expressed in the contract. 563 F.3d at 498-99. In addition to the factual disparity regarding the need for permission to sell a route, *FedEx Home Delivery* found significance with other facts not present here, *e.g.*, some drivers used their FedEx vehicle for other purposes, including a home delivery service, and one driver was able to negotiate for higher fees. 563 F.3d at 498-99. The court discounted FedEx's requirements with regard to uniform, personal appearance, and customer service rides, finding that those factors did not indicate control over drivers but rather they were designed to appease customer safety concerns and ensure that "once a driver wears FedEx's logo, FedEx has an interest in making sure her conduct reflects favorably on that logo." 563 F.3d at 501.

In *Anfinson v. FedEx Ground*, 174 Wash. 2d 851, 281 P.3d 289 (2012), FedEx drivers brought suit under state law claiming a right to overtime pay. The trial court held that the drivers were independent contractors under a right to control test. The Washington Court of Appeals rejected the trial court's use of the right to control test in favor of an "economic dependence" test, whereby the court determines, as a matter of economic reality, whether the alleged employee is dependent upon the business to which he or she renders service. 174 Wash. 2d at 866-71. The Washington Supreme Court agreed, reversing and remanding the matter for retrial utilizing the correct test. 174 Wash. 2d at 867. It would seem that one would be hard pressed to say that the FedEx delivery drivers were not, as a matter of economic reality, dependent upon FedEx's delivery business.

Given that *Wells* and *Estrada* utilized a version of the right to control test, they are most persuasive for our purposes. Our 250% expansion of the number of enumerated factors considered in testing for the employer/employee relationship does not lead us to a different result. To the contrary, the expanded analysis serves to corroborate and reinforce the California trial court's observation

that FedEx's OA is a " 'brilliantly drafted contract creating the constraints of an employment relationship with [the drivers] in the guise of an independent contractor model'—because FedEx 'not only has the right to control, but has close to absolute actual control over [the drivers] based upon interpretation and obfuscation.' " *Estrada*, 154 Cal. App. 4th at 9.

We pause to briefly note that, while this opinion was being finalized, the Ninth Circuit Court of Appeals issued opinions on cases arising out of class actions from California and Oregon dealing with the same subject matter as our certified questions. See *Alexander v. FedEx Ground Packages System, Inc.*, Nos. 12-17458 and 12-17509, 2014 WL 4211107 (9th Cir. 2014) (California) and *Slayman*, 2014 WL 4211422 (Oregon). Focusing on the extent to which FedEx exercised its right to control the drivers, the Ninth Circuit held that, as a matter of law, the FedEx drivers were employees, not independent contractors. *Alexander*, 2014 WL 4211107, at *6-11, 14; *Slayman*, 2014 WL 4211422, at *5-11. Those recent decisions do not alter our answers to the certified questions presented to us from the Seventh Circuit.

### *20-Factor Test Indicates Employer/Employee Relationship*

Next, we proceed to consider each of the individual factors, keeping in mind that the goal is not to simply compare the number of factors favoring one result against the number of factors favoring the other result. To the contrary, we are tasked with viewing the factors as a whole. But where *FedEx Home Delivery* emphasized entrepreneurialism when considering factors cutting both ways, we place the particular emphasis on the company's right to control the worker to tip the scales.

The Seventh Circuit indicated that it was looking for overarching principles to guide the weighing process. If there are such principles, one would be that the KWPA is broadly construed to effect its purpose of protecting workers against the overreaching of employers, such as artificially designating an employee as an independent contractor to permit the withholding of wages for business expenses. On the other hand, the KWPA should not be construed in such a manner that it prevents a worker from having the op-

portunity to enter into a mutually advantageous business arrangement that provides the worker with a legitimate opportunity to generate a profit over and above what a pure wage earner could expect to earn. But perhaps the most fundamental principle is that form should not be elevated over substance, *e.g.*, if a worker is hired like an employee, dressed like an employee, supervised like an employee, compensated like an employee, and terminated like an employee, words in an operating agreement cannot transform that worker's status into that of an independent contractor. With those principles in mind, we proceed to the factors.

### 1. *FedEx's Right to Require Compliance with Its Instructions*

FedEx does not refute that it requires all newly hired drivers to execute a standard agreement, *i.e.*, the OA. See *In re FedEx Ground Package System, Inc.*, 734 F. Supp. 2d 557, 560 (N.D. Ind. 2010). Likewise, it is undisputed that a driver's failure to comply with the instructions in the OA is a ground for termination. Accordingly, FedEx can require compliance with its instructions by threatening termination.

But FedEx argues that the provisions of the OA specifically refute that it has the right to require the drivers to comply with its instructions, pointing to certain OA declarations, including that the driver's services are provided " 'strictly as an independent contractor, and not as an employee' " for any purpose; that the agreement sets forth the parties' " 'mutual business objectives' "; that the multiple contractual requirements placed upon the driver are merely intended to achieve FedEx's desired results; that " 'the manner and means of reaching these results are within the discretion of the [driver]' "; and that " 'no officer or employee of [FedEx] shall have the authority to impose any term or condition . . . contrary to this understanding.' " 734 F. Supp. 2d at 560.

However, as the California court found in *Estrada*, "FedEx's conduct spoke louder than its words." 154 Cal. App. 4th at 11. Moreover, a closer look at the OA's requirements for drivers negates the notion that the drivers have any room for discretion in the manner and means of performing their jobs. Those requirements direct such things as the delivery days and times; delivery

methods; reporting requirements; vehicle identification, specifications, and maintenance; and driver appearance. As noted in *Estrada*, FedEx endeavors to control "every exquisite detail of the drivers' performance, including the color of their socks and the style of their hair." 154 Cal. App. 4th at 11-12.

We first note that there is no indication that any particular "driver" can exercise his or her independence by modifying the OA to the driver's advantage. In other words, the document more closely resembles a unilaterally proffered, take-it-or-leave-it employment contract. Moreover, in conjunction with having to sign the standard OA, prospective drivers must pass background checks and then undergo training. In addition, the OA is not the sole source defining a driver's relationship with the company; there are manuals, handbooks, memoranda, training videos, and other means of communication that direct the manner and means of delivering packages. In short, the procedure by which a driver becomes qualified to deliver packages for FedEx more closely resembles the process by which employees are hired than the process by which independent contractor agreements are negotiated.

With respect to the driver's appearance, the OA requires them to wear a FedEx uniform that is maintained in good condition and requires them to maintain a personal appearance that is " 'consistent with reasonable standards of good order as maintained by competitors and promulgated from time to time by [FedEx].' " *In re FedEx*, 734 F. Supp. 2d at 564. The notion that such requirements are merely unenforceable suggestions is negated by the fact that FedEx reserves the right to refuse to allow a driver to perform his or her deliveries if the driver is not properly dressed or groomed. 734 F. Supp. 2d at 565.

FedEx counters that its appearance standards do not connote the exertion of control over its drivers; rather, those standards are designed and intended to assure its customers that they may feel safe in opening their homes and businesses to drivers displaying the FedEx brand. Of course, the irony of that argument is that FedEx's customers would not feel safe in the presence of the FedEx logo if they did not believe that FedEx's branding of its drivers meant that the company had taken responsibility to con-

form the drivers' actions to replicate the integrity of the company. Certainly, holding out its drivers to the public as being personal representatives of the FedEx company is inconsistent with the argument that the drivers are merely independent contractors who happen to be doing business with FedEx.

FedEx also requires that drivers comply with strict vehicle appearance, specification, and maintenance requirements. For example, each vehicle must be painted "FedEx White" and bear FedEx logos and advertising. 734 F. Supp. 2d at 565. The trucks must be maintained in a clean and presentable fashion free of body damage and extraneous markings. FedEx reserves the right to inspect trucks to ensure they comply with FedEx appearance standards. The vehicles must meet FedEx's minimum specifications for height, width, length, bumper height, interior shelving requirements, and, in some cases, age restrictions. FedEx decides what size and configuration of truck is appropriate for a particular route. FedEx managers may remove a vehicle from service if it does not meet appearance standards or a driver fails to timely submit maintenance reports. 734 F. Supp. 2d at 565-66. And, again, the failure to comply with the vehicle appearance standards constitutes a breach of the OA, which can result in termination.

The *Wells* court opined that "[t]he right to determine and enforce driver and vehicle appearance and vehicle suitability standards also favors employee status." 979 F. Supp. 2d at 1019; accord *In re Corporate Express Delivery Systems and Teamsters Local 886*, 332 NLRB 1522, 1523 (2000) (finding truck owner/operators were employees for purposes of National Labor Relations Act because, *inter alia*, they were required to display company's logo on their vehicles.); cf. *C.C. Eastern, Inc. v. N.L.R.B.*, 60 F.3d 855, 858 (D.C. Cir. 1995) (finding that owner/operators were not employees for purpose of National Labor Relations Act because, *inter alia*, company did not require tractors to be of any specific type, size, or color).

FedEx argues that vehicle appearance standards merely relate to the results for which the company is contracting. For support, FedEx points to *Martin v. Wichita Cab Co.*, 161 Kan. 510, 517, 170 P.2d 147 (1946), which it argues stands for the proposition that

a company may require a worker to utilize its brand without creating an employer/employee relationship. But the factual distinctions in that case render it unpersuasive here. *Martin* involved a company's liability for federal withholding taxes on fares collected by cabdrivers. The company owned multiple cabs that were painted black and white and bore the company's logo. Drivers paid a daily rental for the cabs and did not wear a uniform. The cabdrivers were not paid by the company; they kept their own fares. The company had no control over what area a driver worked or how many fares the driver collected. The holding most germane for our purposes is found in the following statement:

"In our opinion the fact that the company put conditions on the use of its cars and service was just as consistent with a contract of bailment as with a master and servant relationship. There is no evidence that the company directed the drivers in the performance of their work." 161 Kan. at 518.

Here, there is plenty of evidence that FedEx directed the drivers in the performance of their work.

Similarly, FedEx's citation to *Brownrigg v. Allvine Dairy Co.*, 137 Kan. 209, 19 P.2d 474 (1933), is unavailing. In *Brownrigg*, milk distributors were permitted, but not required, to paint the dairy company's name on their delivery trucks. But the determination that the distributors were not employees for respondeat superior purposes hinged on the fact that the dairy company maintained no control over the distributors, *e.g.*, the company did not direct the distributors where to deliver milk or assign them fixed routes or districts. 137 Kan. at 210-12. The facts here are pointedly different; FedEx does assign routes and tell the drivers where to deliver the packages.

The OA provides strict requirements with regard to the handling and delivery of packages. Drivers are required to "[h]andle, load, unload and transport packages using methods that are designed to avoid theft, loss and damage." *In re FedEx*, 734 F. Supp. 2d at 561. In addition, the OA provides that drivers agree to "[c]ooperate with [FedEx's] employees, customers and other contractors, to achieve the goal of efficient pick-up, delivery, handling, loading and unloading of packages and equipment, and provide such electronic

and/or manual data pertaining to package handling as is reasonably necessary to achieve this goal." 734 F. Supp. 2d at 561. FedEx also requires drivers to record information on all package deliveries. 734 F. Supp. 2d at 568 ("FedEx drivers must record information about all package deliveries."). Again, violation of the OA is a ground for termination; therefore, FedEx retains the right to ensure compliance with these requirements.

FedEx also utilizes multiple oversight methods with regard to the OA's handling and delivery requirements. In other words, the company supervises the drivers to assure that the designated manner and means of delivering packages are being followed. Specifically, FedEx managers are to conduct daily van service audits of every driver to ensure compliance with FedEx's procedures for undelivered packages. Failure to follow FedEx's procedures for proper release of packages may constitute a breach of the OA and serve as a ground for termination. 734 F. Supp. 2d at 561, 571 (OA requires drivers to handle packages using methods that are designed to avoid theft, loss, and damage). FedEx also hires experts to perform random security reviews in order to ensure that drivers are securing their vehicles properly when delivering packages. Failure to properly secure a vehicle is also considered a violation of the OA. 734 F. Supp. 2d at 571.

Further, FedEx requires at least two, but not more than four, customer service rides (CSR) each year. The CSRs provide FedEx managers with the opportunity to see if drivers are complying with FedEx's customer service standards and ensure that drivers are operating their vehicles safely. FedEx managers are trained to observe certain things during a CSR, such as the driver's check-in and check-out procedures; how the driver operates, parks, and enters and exits his or her vehicle; the driver's delivery and pickup methods; and whether the driver experiences any delay time in performing his or her work. In addition, the FedEx manager is supposed to make multiple specific written observations regarding the driver's performance in the areas of package quality at delivery, quality assurance, driver release, professional appearance, customer courtesy, and service. 734 F. Supp. 2d at 572-73. During some of the CSRs, a FedEx manager analyzes the driver's primary

service area by documenting such things as the time the driver arrives and departs from each stop, the number of minutes at each stop, the number of minutes between stops, the last three digits of the driver's odometer reading at each stop, and the approximate distance a driver must walk to pick up or deliver a package. 734 F. Supp. 2d at 573.

FedEx managers are expected to conduct at least two "business discussions" with drivers each year. 734 F. Supp. 2d at 570. The business discussions are considered procedures and not mandatory policies. The business discussions are designed to allow FedEx managers to provide recommendations and counseling to drivers in performing their contracted work. A FedEx manager may request a business discussion for multiple reasons, including problems with the driver's performance related to undelivered packages, missed pickups, and improper documentation. Although FedEx may not force a driver to participate in a business discussion, failure to participate may reflect poorly on the driver's opportunity to renew his or her OA. Moreover, documentation from business discussions can be used to support contract termination. 734 F. Supp. 2d at 571.

Further, FedEx managers are encouraged to conduct a "business plan" discussion with drivers each year. 734 F. Supp. 2d at 573. During the documented discussion, FedEx managers go over problem areas, agreed-upon solutions, delivery areas, and driver expectations. A business plan discussion form provides spaces for the manager to document the following information: the driver's total number of stops, packages, miles, and DOT hours of work; anticipated changes in the driver's primary service area; the condition and appearance of the driver's equipment; any deficiencies and expected correction dates; the number and types of complaints the driver has received in the last 12 months; the driver's contingency plan in the event of a vehicle breakdown; and any comments or questions the driver may have. 734 F. Supp. 2d at 573.

FedEx maintains that the audits, CSRs, and business discussions result in recommendations, not mandatory requirements that drivers must follow. Nevertheless, FedEx acknowledges that the audits, CSRs, and discussions are at times used to instruct drivers that

have violated the OA by failing to deliver packages, improperly scanning or recording packages, missing set times for the pickup of packages, having customer complaints, or other "service failures." 734 F. Supp. 2d at 573. Given that the oversight procedures can eventually lead to a driver's termination, the "advisory" nature of the procedures appears to be suspect, at best. But more importantly, one would expect to find such close supervision of the means and manner by which the driver effects deliveries in an employer/ employee relationship. If there is an independent contract to deliver a package to a specific location in a timely manner, the place that the independent contractor parks or the number of steps the contractor must walk to fulfill the contract should not be a concern for the company, so long as the package is delivered when and where the customer expected.

In that vein, FedEx fashions an argument that characterizes the control it exercises over the drivers as affecting the results of the work to be completed rather than the means and methods the driver must employ to reach those results. Of course, FedEx must utilize that characterization to comport with our caselaw.

In *Falls v. Scott*, 249 Kan. 54, 64, 815 P.2d 1104 (1991), we defined an independent contractor as one who, in exercising an *"independent employment*, contracts to do certain work *according to his* [or her] *own methods*, without being subject to the control of his [or her] employer, *except as to the results or product of his* [or her] *work*." (Emphasis added.) In contrast, in an employer/ employee relationship, the employer has the right to direct the manner in which the work is to be performed, in addition to the result to be accomplished. 249 Kan. at 64. Some 60 years earlier, in *Shay v. Hill*, 133 Kan. 157, 159, 299 P. 263 (1931), we obtained a definition of an independent contractor from the American Law Institute Restatement on Agency:

" 'Sec. 6. An independent contractor is a person who undertakes to execute certain work or to accomplish a stipulated result for another, under such circumstances that the right of control of the doing of the work, and of the forces and agencies employed in doing it, is in the contractor.

" 'Comment: (a) The characteristics of the independent contractor are that he is a person (usually carrying on a distinct occupation) who for a stipulated com-

pensation (usually a lump sum) undertakes to do a piece of work (usually of some magnitude) by his own forces and instrumentalities (usually supplying labor and materials), being responsible to his employer for the stipulated results, but (essential characteristic) being left in control of the operation of the forces and instrumentalities by which the stipulated result is to be accomplished.' [American Law Institute, Agency: Restatement No. 1 § 6 (Tentative Draft 1926)]."

FedEx would have us blur the distinction between what work is to be done and how the work is to be done. There is some precedent for such obfuscation. In *Lorenz Schneider Co., Inc. v. N.L.R.B.*, 517 F.2d 445, 451 (2d Cir. 1975), the court found difficulty in making the distinction between controlling the means and controlling the result:

"Yet the test as thus stated is almost impossible to apply, since the 'result' is a function of the 'manner and means.' . . . All that can be meaningfully said is that *the more detailed the supervision and the stricter the enforcement standards*, the greater the likelihood of an employer-employee relationship, and conversely." (Emphasis added.)

FedEx provides package pickup and delivery services to residential and business clients. We do not discern a great deal of difficulty in distinguishing between the results to be accomplished in that business and the manner and means by which those results are accomplished. For instance, requiring a driver to wear clothes of a certain type or to exit the delivery vehicle in a certain manner is clearly exercising control over the manner and means by which packages are picked up or delivered. But even if we apply the *Lorenz* standard above, the extensive detail of FedEx's supervision of its drivers and the strict enforcement of the OA requirements under penalty of termination point to an employer/employee relationship. *Cf. North American Van Lines, Inc. v. N.L.R.B.*, 869 F.2d 596, 599 (D.C. Cir. 1989) (global oversight is compatible with independent contractor relationship, whereas control over details of a performance is indicative of employer/employee relationship).

2. *The Extent of Training Provided by FedEx*

Whether FedEx trains its drivers is a factor because ordinarily one does not hire an independent contractor that requires training. *Cf. Wallis v. Secretary of Kans. Dept. of Human Resources*, 236

Kan. 97, 106-07, 689 P.2d 787 (1984) (finding that vacuum cleaner dealers were employees based, in part, on fact that distributor maintained direction and control with respect to dealers' training). The undisputed facts in this case do not clearly favor either status.

FedEx requires all new drivers to undergo an orientation program during their first 30 days to familiarize them with various service quality procedures. *In re FedEx*, 734 F. Supp. 2d at 564. As of 2005, new FedEx drivers with 6 months' verified experience as a commercial motor vehicle operator within the previous 5 years are not required to participate in a FedEx program entitled "Quality P & D Learning" (QPDL). 734 F. Supp. 2d at 563. QDPL is a multiday course consisting of classroom and on-the-road instruction designed to ensure compliance with federal safety regulations. The QDPL manual also contains instruction regarding a number of topics, including customer service skills, vehicle entrance and exit routines, route planning, delivery techniques, package handling techniques, proper scanning, and documentation. 734 F. Supp. 2d at 564.

FedEx claims that QDPL is not training but is rather a precondition to becoming a driver. Moreover, in November 2007 FedEx began accepting training from an "approved" FedEx vendor in lieu of the prior experience exemption or completion of the QDPL course. 734 F. Supp. 2d at 563. In other words, some of the FedEx drivers are not trained by FedEx.

FedEx also offers a "CARE" training program for drivers seeking to expunge a verified customer complaint from their FedEx record. The CARE program instructs drivers on ways to achieve customer satisfaction and practices to follow in order to avoid further customer complaints. 734 F. Supp. 2d at 564.

At one time, FedEx provided a handbook entitled the "Contractor's Companion" to drivers, which provided information concerning customer service tips, scanner troubleshooting, daily supply checklists, vehicle pretrip inspections, C.O.D. handling, driver release guidelines and tips, pickup tips, and FAQs for different types of situations the driver might encounter. 734 F. Supp. 2d at 564. FedEx no longer provides the handbook to its drivers, al-

though the record does not indicate when this practice stopped. 734 F. Supp. 2d at 564.

### 3. *The Degree of Integration of the Drivers' Services into FedEx's Business*

Where the services that a worker performs for a principal are an integral part of the principal's business, the scale tips in favor of that worker being an employee. Businesses do not ordinarily trust their core functions to independent contractors, over which the business has minimal control.

FedEx argues that the drivers' services are complementary to, but distinct from, FedEx's business. To the contrary, the *Estrada* court looked at the FedEx scenario and determined that "[i]n practice, . . . the work performed by the drivers is wholly integrated into FedEx's operation." *Estrada v. FedEx Ground Package System, Inc.*, 154 Cal. App. 4th 1, 9, 64 Cal. Rptr. 3d 327 (2007). We agree.

FedEx's business is to take a package from one person or entity and deliver it to another person or entity; it does not manufacture or sell any product or perform any other service. A driver delivering hamburger to a fast-food restaurant is performing a service that complements the business of selling sandwiches. A driver leaving a Frito-Lay plant with a semitrailer full of potato chips is performing a service that complements the business of manufacturing and selling snack foods. To the contrary, when a FedEx driver delivers a package, he or she has performed the sole service that FedEx offers. There is nothing complementary about that because without the delivery drivers there is no FedEx business. Indeed, a former chief executive officer of FedEx testified that the drivers are the " 'centerpiece' of FedEx's 'work force,' " and are "an 'essential component of [FedEx's] business.' " *In re FedEx Ground Package System, Inc.*, 734 F. Supp. 2d 557, 562 (N.D. Ind. 2010).

In short, the plaintiff drivers are integrated into FedEx's business to the highest degree possible, and this factor weighs heavily in favor of an employer/employee relationship. *Cf. Olds-Carter v. Lakeshore Farms, Inc.*, 45 Kan. App. 2d 390, 403, 250 P.3d 825 (2011) (holding that plaintiff truck driver was employee for workers

compensation purposes based, in part, on finding that employee's duties were integral part of employer's commercial trucking operation).

### 4. *The Requirement that the Services be Provided Personally by the Drivers*

If the principal is only controlling the result—not the manner and means by which the result is accomplished—the principal would ordinarily not be concerned whether the actual work was personally performed by the worker. Consequently, a requirement that the worker personally perform the job suggests that the principal is interested in the methods used to accomplish the work, not just the results, which is indicative of an employer/employee relationship.

First, we note that because the certified class is defined as including full-time drivers, all of the plaintiffs in this action are personally providing services to FedEx. FedEx acknowledges that the class is limited to full-time drivers who signed the OA, but it contends that the issue is whether "class members *possess* the right to hire others, not the extent to which individual contractors exercise those rights."

FedEx's point is well taken. The efficacy of this factor hinges on whether the principal *requires* personal service, rather than depending on whether the worker chooses to personally perform the agreed-upon tasks. In that regard, FedEx does allow its drivers to hire others to drive their trucks in the drivers' assigned service areas, subject to FedEx's approval and supervision. Although FedEx maintains considerable control over the replacement drivers, this factor nevertheless tilts toward finding an independent contractor relationship.

### 5. *The Hiring, Supervision, and Compensation of Assistants*

Closely related to the preceding factor is the consideration of whether drivers are responsible for hiring, supervising, and paying any assistants they might require. Under the OA, FedEx drivers are allowed to run their own routes, hire helpers, or hire replacement drivers. But as noted above, FedEx makes a number of

requirements in that area. For instance, it requires that nondriver helpers must be 18 years old and pass a background check. Replacement drivers must be approved by FedEx and are subject to several conditions, such as completing a road test; submitting a driver information sheet; and, depending on experience, completing a FedEx-approved training course. *In re FedEx*, 734 F. Supp. 2d at 562-63.

But most importantly for our purposes, drivers are responsible, at their own expense, for training their assistants to operate the equipment, for ensuring that any replacement driver conforms to a driver's obligations under the OA, and for compensating replacement drivers. Again, notwithstanding the tighter than usual control exerted by FedEx over a driver's assistants, this factor shades in favor of an independent contractor relationship.

### 6. *The Existence of a Continuing Relationship between Drivers and FedEx*

Next, we consider the continuity and duration of the relationship between FedEx and its individual drivers. A short-term or intermittent relationship is more typical with respect to independent contractors. See *Baker v. Flint Engineering & Const. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998) (short duration relationship indicative of independent contractor status). On the other hand, in an employer/employee relationship, a worker expects to be engaged for an indefinite period of time. See *Dole v. Snell*, 875 F.2d 802, 811 (10th Cir. 1989) (expectation to work for employer indefinitely is indicative of employer/employee relationship).

FedEx contends that this factor favors its position because the OAs are for a fixed term, between 1 and 3 years, with no guarantee of renewal. For support, FedEx cites to *Home Design, Inc. v. Kansas Dept. of Human Resources*, 27 Kan. App. 2d 242, 2 P.3d 789, *rev. denied* 269 Kan. 932 (2000), claiming that it stands for the proposition that choosing to renew a fixed-term contract is not inconsistent with an independent contractor relationship. But that case did not revolve around the renewal of continuing contracts but rather it involved the letting of serial contracts. Siding installers that did a good job for Home Design could expect repeat business,

*i.e.*, could expect to be hired again to side other homes. The critical factor in *Home Design* was "that there was no continuity in the relationship between Home Design and the siding installers." 27 Kan. App. 2d at 247.

Here, in contrast, drivers work continuously for FedEx until terminated. The OAs are automatically renewed for 1-year terms in the absence of a notice of nonrenewal or a breach of the agreement. *In re FedEx*, 734 F. Supp. 2d at 574. Ironically, FedEx argues elsewhere that the OAs are not arbitrarily terminated for any "perceived breach" but rather FedEx is obliged to act reasonably and in good faith. Moreover, there is no evidence that the OAs are not automatically renewed where drivers are performing satisfactorily. To the contrary, FedEx encourages a long and continuous relationship by providing bonuses based upon a driver's longevity, and providing a time-off program that is tied to a driver's seniority.

In short, the duration and continuity of the relationship between FedEx and its delivery drivers point directly to an employer/employee relationship.

### 7. *The Degree to Which FedEx Establishes Set Work Hours for Drivers*

Obviously, telling a worker what hours he or she must work is the type of control over manner and means that is typical in an employer/employee relationship. As anyone who has contracted for the replacement of a roof during a Kansas August knows, an independent contractor will expect to set working hours to suit the contractor. But FedEx drivers do not have the unfettered discretion to set their own hours, as for example to only work during the coolest part of a summer day.

FedEx argues that it does not set the work hours for its drivers and, in fact, it does not even require a driver to personally drive the truck. But, as noted, the members of the certified class in this case all personally drive for the company. And while FedEx does not set a time certain that a driver must appear at the terminal or a time certain that a driver quits for the day, it sets other rules and conditions that effectively outline the hours of work.

First, drivers are required to provide service on the days that FedEx is open for business, and FedEx retains the authority to change the days of service. There is no set time that a driver must report to the terminal, but packages can only be picked up during the hours that a terminal is open, and all packages are expected to be delivered the same day. Further, FedEx can require that certain packages be delivered or picked up within a specified time frame when so requested by customers. For instance, the company offers its home delivery customers the option to have packages delivered between 5 p.m. and 8 p.m., and drivers must honor that time frame or have another driver make the delivery. Drivers who only deliver packages are not required to return to a FedEx terminal at the end of the day unless they have collected C.O.D. charges or have undelivered packages. Drivers who pick up packages from customers must return to the terminal by a certain time and perform a "check-in" process. *In re FedEx*, 734 F. Supp. 2d at 569.

In sum, this factor cuts both ways. While FedEx's control over the work hours of a delivery driver is not as strictly defined as that of a typical employee, neither does the company afford the driver complete discretion on when to perform his or her work. To meet FedEx's requirements and stay in compliance with the OA, a driver must work long hours that can include a time frame that is dictated by the company.

### 8. *A Requirement that Drivers Devote Full Time to FedEx's Business*

Overlapping with the foregoing factor is the consideration of whether the principal requires the worker to be engaged full time. It would not be unusual for an independent contractor to be concurrently working on several projects at a given time, whereas working full time, all the time, for one entity connotes an employment scenario.

Again, FedEx asserts that it does not specifically require its drivers to be engaged in full-time work. But that assertion cannot withstand a reality check. The OA directs that a driver must "[m]ake reasonable efforts to retain and increase the base of shippers and consignees served and the number of packages per shipper within

Contractor's Primary Service Area." 734 F. Supp. 2d at 561. Of course, FedEx establishes the service area, the customer base, the packages to be delivered, *etc.*, and directs that it all must be done the same day. The goal of FedEx managers is to establish a workload that will require 9 to 11 hours to complete. 734 F. Supp. 2d at 590. While FedEx claims that the policy of establishing long work days was intended to benefit the drivers, it nevertheless results in the drivers working full time for the company. Moreover, as will be discussed later, those long days are a logistical impediment to the drivers being able to work for anyone else.

### 9. *The Degree to Which Work is Performed on FedEx's Premises*

If the work is performed on the principal's premises, it can suggest that the principal has more control over the worker, especially if the work could have been performed elsewhere. But under the facts of this case, this factor is not separately compelling beyond our previous discussion of the control that FedEx exerts over the drivers. The services that FedEx provides are, for the most part, performed off of its premises, regardless of whether the driver is an employee or an independent contractor.

The only work performed by drivers on FedEx's premises is the daily pickup and loading of packages, as well as any required end-of-the-day return of packages, documentation, or money. On the other hand, none of the work is performed on the driver's own premises. Nevertheless, this factor is essentially neutral.

### 10. *The Degree to Which FedEx Sets the Order and Sequence of the Driver's Work*

FedEx does not directly mandate the order in which packages must be delivered, except in those instances where a customer has requested a specific time for the pickup or delivery of a package. But there is at least implicit oversight of such matters, as evidenced by the manager's analysis of a driver's primary service area during a CSR. The manager will observe and document such things as the number of minutes at each stop, the number of minutes between stops, the odometer reading at each stop, and the distance a driver must walk to pick up or deliver a package. Presumably, that data

is utilized to improve the driver's order and sequence of work. As with other aspects of the OA, FedEx has cleverly disguised its control over a driver's ordering and sequencing of his or her workload. Nevertheless, FedEx does not explicitly retain the right to set the order or sequence of deliveries.

11. *Required Oral or Written Reports*

Requiring a worker to submit regular or written reports is a form of control. The OA provides that drivers must record information about all package deliveries. Drivers are required to record on-duty time, dispatch and return times, package tracking information, and odometer readings. 734 F. Supp. 2d at 568. Federal regulations require FedEx to monitor drivers' on-duty and driving times, as well as some information related to shipping. 734 F. Supp. 2d at 568.

FedEx does not directly address this factor in its briefing, but presumably the company would claim that the reporting requirements are necessary to comply with the company's regulatory responsibilities and to meet customer demands for information. Nevertheless, FedEx does have control over reporting requirements, and a driver's failure to comply puts the driver's job in jeopardy.

12. *The Manner of Payment to the Drivers, e.g., by the Hour, Day, or Job*

The manner of determining compensation is a factor because, typically, an hourly or daily rate of pay is more common for an employee, while a flat-rate, per-job arrangement is used more often for independent contractor relationships. *McDonnell v. The Music Stand, Inc.*, 20 Kan. App. 2d 287, 291, 886 P.2d 895 (1994), *rev. denied* 256 Kan. 995 (1995).

The weekly compensation for FedEx drivers combines both daily rates and piece rates. Plus, there are various bonuses, including bonuses for years of service and performance. Although some drivers receive additional payment for delivering packages in "low density, low package volume areas," generally drivers are compensated based on the number of packages delivered, as well as the quality of service they provide. *In re FedEx*, 734 F. Supp. 2d at 567. Per-

haps most telling, the compensation rates are not negotiable by an individual driver. 734 F. Supp. 2d at 567.

Likewise, FedEx offers additional forms of compensation that seem to be inconsistent with an independent contractor scenario. For instance, the company matches contributions to the "Service Guarantee Account," which is an interest-bearing fund that allows a driver to save for unexpected expenses and may be withdrawn at the driver's discretion; it offers a college scholarship for drivers with children; and it maintains a time-off program based on seniority. 734 F. Supp. 2d at 567-68.

13. *The Extent to Which FedEx Pays Drivers' Expenses*

Drivers are responsible for all costs and expenses associated with their vehicles, including maintenance, fuel, taxes, and insurance. 734 F. Supp. 2d at 565. Fed Ex does not pay any expenses related to health insurance, welfare, pension, income taxes, unemployment insurance premiums, or Social Security taxes. 734 F. Supp. 2d at 568. This factor weighs heavily against a finding of an employer/employee relationship.

14. *The Degree to Which FedEx Furnishes Tools, Equipment, and Material*

Ordinarily, one expects an independent contractor to possess the tools, equipment, and materials necessary to fulfill its obligations under the contract. Often, the principal would not, as a matter of course, have occasion to possess the tools, equipment, and materials necessary for the contracted job.

Here, FedEx requires the plaintiff drivers to purchase all of the tools, equipment, and materials necessary to perform their services under the OA. Specifically, drivers are required to purchase trucks, uniforms, scanners, printers, and communications-related equipment. 734 F. Supp. 2d at 566. Pointedly, most of the items that the drivers are required to purchase are unique to FedEx's everyday operations rather than being necessary items for generic delivery drivers. For instance, the drivers, as independent contractors, could not use FedEx's uniforms or scanners to move furniture after hours. In other words, the fact that the worker owns his or

her own tools and equipment is not as compelling a factor when that ownership is not for the benefit of the worker.

Likewise, FedEx has again injected its control into the process. The company provides a mechanism for drivers to purchase their tools and equipment directly from FedEx and then to pay for them through weekly payroll deductions. 734 F. Supp. 2d at 566. Granted, the drivers are not *required* to purchase their tools and equipment from FedEx, but as a practical matter, that is what happens; 99 percent of the drivers exercise the payroll deduction purchase option. 734 F. Supp. 2d at 566.

In short, this factor superficially supports an independent contractor relationship, albeit the context must be considered in reviewing the totality of the circumstances.

### 15. *Whether Drivers Must Make a Significant Investment*

Obviously, from the preceding factor, it is evident that drivers must make a significant personal investment in order to have the privilege of driving for FedEx. The only mitigating circumstance is that FedEx softens the financial hit by carrying the paper on that investment.

### 16. *The Ability of Drivers to Make a Profit or Suffer a Loss*

The concept of profit and loss, *i.e.*, the ability to generate an unlimited amount of revenue in excess of expenses while risking that expenses might exceed revenues, is generally associated with the operation of an independent business. But the fact that a worker's income can vary according to the effort expended by the worker does not necessarily negate the existence of an employment relationship. See *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal. 3d 341, 357-58, 256 Cal. Rptr. 543, 769 P.2d 399 (1989) (fact that sharefarmers can earn more money by picking more and better quality cucumbers is not indicative of ability to incur a loss or profit); *Quality Medical Transcription v. Woods*, 91 S.W.3d 181, 189-90 (Mo. App. 2002) (fact that transcriptionist can earn more money by completing more transcriptions is not indicative of ability to incur a profit or loss). The Tenth Circuit has declared that "toiling for money on a piecework basis

is more like wages than an opportunity for 'profit.' " *Dole v. Snell,* 875 F.2d 802, 809 (10th Cir. 1989).

To truly have the ability to make a profit, a business owner must have control over the amount of revenues generated and control over the amount of expenses incurred. Under FedEx's compensation formula for a class member—one who drives his or her vehicle full time—the only practical way to increase "profits" is to increase the number of packages the driver delivers in a day. FedEx's required specifications for the vehicles, tools, equipment, materials, and clothing a driver must use makes any significant reduction on the expense side impracticable. Interestingly, FedEx even attempts to insulate its drivers from suffering losses by paying additional compensation when the number of customers or accounts is reduced because of the company's route reassignment. *In re FedEx,* 734 F. Supp. 2d at 574.

Even on the revenue side of the equation, FedEx restricts a driver's control over the "profits" that can be earned. For example, if FedEx determines a driver is unable to deliver all the packages in his or her service area for the day, FedEx may reassign those packages to another driver. 734 F. Supp. 2d at 570. Likewise, FedEx used to employ a "Service Flex Range" that determined the " 'minimum and *maximum* number of stops that can be delivered by a trained contractor working at "industry standard" time.' " (Emphasis added.) 734 F. Supp. 2d at 570. In 2005, FedEx eliminated the minimum number of stops, but it still sets the maximum number of stops it believes a driver, "while utilizing his vehicle fully, reasonably can handle on any given day." 734 F. Supp. 2d at 570. FedEx also reserves the right to reconfigure a driver's route unless the driver establishes, during a set period of time, that he or she can "continue to provide in such Primary Service Area the level of service called for in this Agreement." 734 F. Supp. 2d at 574.

Granted, some provisions are consistent with the drivers being business owners. For instance, drivers are allowed to sell excess stops as an alternative to reconfiguration, and they can even sell their routes upon 30 days' written notice to FedEx, albeit the company must approve the buyer. Conversely, a driver whose contract

is terminated for cause may not sell or assign his or her route to another. *In re FedEx Ground Package System, Inc.*, 734 F. Supp. 2d 557, 574 (N.D. Ind. 2010).

Ultimately, a driver's ability to make a profit is constrained by FedEx's control over the route assignments and the number of deliveries a driver can make, while the company's policies also serve to reduce a driver's risk of suffering a loss. While FedEx has been creative in structuring the "business arrangement" to look like an independent contract, the drivers' business opportunities are tightly controlled.

### 17. *Whether Drivers Can Work for More than One Company at a Time*

Technically, FedEx does not prohibit its drivers from working for another company, but it makes some stringent requirements. For instance, even though a driver must own and maintain the delivery truck, the driver cannot use that truck to do other work without masking or removing all markings that identify FedEx.

More importantly, however, the plaintiffs, by class certification definition, "drive a vehicle on a full-time basis" for FedEx. *Craig v. FedEx Ground Package System, Inc.*, 686 F.3d 423, 425 n.1 (7th Cir. 2012). If a worker is employed full time by one entity, he or she can only work for another company during the worker's free time, *i.e.*, after hours, weekends, days off. The fact that a full-time worker is not prohibited from pursuing other jobs during the worker's free time is not a compelling factor. See *Dole*, 875 F.2d at 808 (allowing worker to pursue other jobs not compelling where job could have been done "by any employee on his or her own time after hours, on weekends, or days off").

Moreover, it would be impracticable, if not illegal, for the drivers to deliver for another company on days the drivers work for FedEx. FedEx endeavors to provide drivers with 9 to 11 hours of work each day. That leaves scant time to mask all the required markings on the vehicle to commence another job. Further, DOT places limitations on how many hours a driver can operate each day, thus limiting the drivers' ability for after-work jobs. See 49 C.F.R. §

395.3 (2013) (maximum driving time for property-carrying vehicles).

Thus, outwardly this factor supports the notion of an independent contractor. As a matter of reality and practicality, the full-time drivers are unable to work for more than one company at a time. *Cf. Dole*, 875 F.2d at 808 (" '[I]t is not what the [workers] *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive.' " [quoting *Brock v. Mr. W. Fireworks, Inc.*, 814 F.2d 1042, 1047 (5th Cir. 1987)]).

### 18. *Whether Drivers' Services Are Regularly and Consistently Made Available to the General Public*

Obviously, an employee regularly serves the employer, not the general public, whereas an independent contractor would be expected to advertise the availability of the contractor's services. Here, there was no evidence that any of the drivers regularly offered to serve the general public. Given our discussion in the foregoing factor about the lack of time available to work for others, it is difficult to perceive how a driver could regularly make his or her services available to the general public. This factor does not favor an independent contractor relationship.

### 19. *Whether FedEx Has the Right to Discharge Drivers*

Neither *Crawford* nor *Hartford* explained the significance of the right to discharge a worker. But the IRS, in Revenue Ruling 87-41, provided the following explanation:

"19. RIGHT TO DISCHARGE. The right to discharge a worker is a factor indicating that the worker is an employee and the person possessing the right is an employer. An employer exercises control through the threat of dismissal, which causes the worker to obey the employer's instructions. An independent contractor, on the other hand, cannot be fired so long as the independent contractor produces a result that meets the contract specifications. Rev. Rul. 75-41, 1975-1 C.B. 323." Rev. Rul. 87-41, 1987-1 C.B. 296.

While FedEx can exercise control over the drivers through the threat of dismissal for violating the OA, the company does not possess the right to discharge drivers without cause. To the contrary, if a FedEx manager seeks to terminate the OA for a " 'contractor who has breached or failed to perform . . . contractual ob-

ligations, as evidenced by repeated customer complaints, failure to service his/her work area, integrity issues, unsafe driving, D.O.T. and/or maintenance violations, or other such problems,' " the manager is to compile documentation establishing such violations and advise whether steps were taken to counsel, train, and otherwise help the driver to overcome the violations. *In re FedEx*, 734 F. Supp. 2d at 575. After an internal review process is complete and the recommended termination is found to be warranted, a driver may request arbitration in order to pursue a claim of wrongful termination. If the arbiter determines termination was not within the terms of the OA, FedEx may either reinstate the driver with damages from the date of termination through the date of reinstatement or maintain the termination and pay damages from the date of termination through the expiration of the contract term.

In short, FedEx does not possess the right to discharge a driver without cause.

20. *Whether Drivers Have the Right to Terminate the Relationship*

The revenue ruling describes the significance of this factor as follows:

"20. RIGHT TO TERMINATE. If the worker has the right to end his or her relationship with the person for whom the services are performed at any time he or she wishes without incurring liability, that factor indicates an employer-employee relationship. See Rev. Rul. 70-309." Rev. Rul. 87-41, 1987-1 C.B. 296.

The OA provides that a driver can unilaterally end the relationship upon giving 30 days' written notice. Notwithstanding the notice requirement, the fact that a driver can quit before the end of the OA term without financial consequences supports the existence of an employment relationship. Ordinarily, independent contractors are expected to complete all of the work contemplated by the contract.

*Conclusion*

Viewing the factors as a whole leads to the conclusion that FedEx has established an employment relationship with its delivery drivers but dressed that relationship in independent contractor cloth-

ing. Even where the factors should point us toward finding that the drivers are independent businesspersons, FedEx's control and micromanaging undermine the benefit that a driver should be able to reap from that arrangement. For instance, the ability to make more money than a delivery driver who is an employee is diminished, if not destroyed, by FedEx's control over the number of deliveries a driver can make, as well as essentially dictating the driver's required expenditures for vehicles, tools, equipment, and clothing. Moreover, one would reasonably expect that independent businesspersons could decide for themselves the amount of work they "reasonably can handle on any given day," *In re FedEx Ground Package System, Inc.*, 869 F. Supp. 2d 942, 958 (N.D. Ind. 2012), yet FedEx makes that decision for them and sets a maximum number of stops for each driver.

Consequently, we hold that under the undisputed facts presented, the FedEx delivery drivers are employees for purposes of the KWPA.

## QUESTION 2: MULTIPLE ROUTE DRIVERS

In its second question, the Seventh Circuit refers us back to our answer to the first question. Our answer to the first question was predicated on the definition of the class members as being full-time drivers. Accordingly, we interpret the second question as asking whether a full-time FedEx driver, who we have determined to be an employee of FedEx, loses that status with respect to the driver's personal route when the driver acquires one or more other routes for which he or she is not the driver. We answer "no" to our reformulated question. In other words, the employer/employee relationship between FedEx and a full-time delivery driver with respect to the assigned service area is not terminated or altered when the driver acquires an additional route for which he or she is not the driver.

Our statutory authority for entertaining certified questions, K.S.A. 60-3201, specifies that we may answer such questions "when requested by the certifying court if there are involved in any proceeding before it questions of law of this state *which may be determinative of the cause then pending in the certifying court.*"

(Emphasis added.) See *Pfeifer v. Federal Express Corporation*, 297 Kan. 547, 548, 304 P.3d 1226 (2013). Given that the certified class only includes full-time drivers, we decline to opine on a driver's status with respect to any assigned service area for which he or she is not a full-time driver.

MORITZ, J., not participating.
DANIEL D. CREITZ, District Judge, assigned.