(2 P.3d 789)
No. 80,951

HOME DESIGN, INC., *Appellant*, v. KANSAS DEPARTMENT OF HUMAN RESOURCES, *Appellee*.

Opinion filed January 14, 2000.

*Thomas D. Arnhold*, of Hutchinson, for appellant.

*Merrill J. Hicklin Befort*, of Kansas Department of Human Resources, for appellee.

Before BRAZIL, C.J., JANICE D. RUSSELL, District Judge, assigned, and JOHN E. SANDERS, District Judge, assigned.

SANDERS, J: Home Design, Inc., appeals the ruling of the district court and the Kansas Department of Human Resources (KDHR) that certain people working for Home Design were employees and not independent contractors.

The standard of judicial review of a state administrative agency action is defined by the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq. National Council on Compensation Ins. v. Todd*, 258 Kan. 535, 538, 905 P.2d 114 (1995). An appellate court exercises the same review of the agency's action as does the district court. The appellate court must accept as true the evidence and all inferences to be drawn therefrom that support or tend to support the findings of the fact-finder. *Reed v. Kansas Racing Comm'n*, 253 Kan. 602, 609-10, 860 P.2d 684 (1993).

In accordance with K.S.A. 77-621(c)(4), the court's scope of review is unlimited on questions of law, *i.e.*, does an employer/employee relationship exist, and we may substitute our judgment for that of the agency. On factual questions we examine the evidence to determine if the agency's decision is supported by evidence which is substantial when viewed in light of the record as a whole. K.S.A. 77-621(c)(7).

We find some of the agency's decision is supported by substantial evidence and some is not. Thus, we reverse parts of the decision and affirm other parts as set forth below.

Many of the relevant facts in this case are undisputed. Home Design is a corporation which sells and installs siding, as well as doing general contracting work on homes. Home Design does have some employees, such as an expediter, office staff, telemarketers, and employee salespersons. It also uses other persons it deemed to be independent subcontractors. One group of these other persons primarily installed siding, while another group did general construction work, and still other individuals acted as salespersons for Home Design.

## Siding Installers

KDHR asserts that case and statutory law support the conclusion that the siding installers were employees. As noted above, when

reviewing the agency's interpretation of questions of law, our review is not limited by K.S.A. 77-621, and we may substitute our judgment for that of the agency. See *National Gypsum Co. v. Kansas Employment Security Bd. of Review*, 244 Kan. 678, 682, 772 P.2d 786 (1989).

"There is no absolute rule for determining whether an individual is an independent contractor or an employee. The facts and circumstances in each case determine the status of the individual." *Crawford v. Kansas Dept. of Human Resources*, 17 Kan. App. 2d 707, 709, 845 P.2d 703 (1989), *rev. denied* 246 Kan. 766 (1990).

"An independent contractor is defined as one who, in exercising an independent employment, contracts to do certain work according to his or her own methods, without being subject to the control of the employer, except as to the results or product of his or her work. The primary test used by the courts in determining whether the employer-employee relationship exists is whether the employer has the right of control and supervision over the work of the alleged employee, and the right to direct the manner in which the work is to be performed, as well as the result which is to be accomplished. It is not the actual interference or exercise of the control by the employer, but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor." *Mitzner v. State Dept. of SRS*, 257 Kan. 258, Syl. ¶ 2, 891 P.2d 435 (1995).

An independent contractor is "one who, in the exercise of an independent employment, contracts to do a piece of work according to his own methods and who is subject to his employer's control only as to the end product or final result of his work." *Wallis v. Secretary of Kans. Dept. of Human Resources*, 236 Kan. 97, 102, 689 P.2d 787 (1984).

The application of siding is the kind of work which can be performed by either independent installers or the actual employees of a particular company.

On siding jobs, Home Design receives leads either by word of mouth or from its telemarketers. A salesperson then contacts the homeowner, measures the house, sets a price, and eventually signs a contract with the homeowner. The job is then turned over to the expediter, who looks at the measurements and the type of siding and makes out a bill of materials. The expediter also calculates an amount Home Design is willing to pay a siding subcontractor to

install the siding. The installation payment amounts are based on predetermined dollar amounts per square and per lineal foot of siding, with allowances for the number of doors and windows. An additional amount per unit is added if the job is more than 50 miles away.

During the normal course of business, various siding installers contact Home Design looking for work. Oftentimes the salesperson specifies which siding installer should be considered for the job. Home Design *then contacts siding installers to see if they are interested or available to work.*

The siding installer examines the specification sheet, sometimes inspects the house, *and then decides whether to take the job.* Some of the more experienced installers will negotiate the price with Home Design. *Each of the siding installers testified that he was free to pick the jobs he wanted.* An investigator for KDHR testified that some siding installers told her that Home Design would be upset if the installer would work for another siding company if Home Design had work available at the time. If the siding installer decided to take the job, he would take the materials list to a supply house. Home Design provided all the siding materials to complete the job. The siding installer could then haul the materials to the job site himself or Home Design would ship them. If the siding installer hauled the materials, he was paid extra if the job was over a predetermined distance.

The installer would then apply the siding. There was testimony that the way the siding was installed was up to the subcontractor. There was also testimony that the siding had to be installed correctly per the manufacturer's specifications or the warranty could be voided. This was a requirement, of course, of the siding manufacturer, not Home Design.

Home Design sometimes set overall completion date targets. There was also testimony that Tim Henry, Home Design's general manager, wanted the siding installers on the job at a decent time, *i.e.*, around 8 a.m., and wanted them to put in a good day's work. Home Design also told the siding installers that they should dress appropriately and should behave in a decent manner. Other than these general requirements, there was no evidence that Home De-

sign actually controlled the work of the siding installers or instructed them on how to perform their tasks or install the siding. These general instructions were nothing more than what would be expected of any subcontractor working under the overall auspices of a general contractor. It strikes us that a general contractor on a major project, *e.g.*, the construction of a bridge or a highway, would develop, in conjunction with the engineers, very detailed and specific instructions as to the work desired of the subcontractors, including the exact way certain items should be installed or erected, along with very specific cutoffs and deadlines for completion of various phases of the project. Surely it would not be seriously argued that such indicia would turn subcontractors into employees even if they were such subcontractors as bridge painters or the landscapers responsible for scattering grass seed after the job was completed.

Home Design simply did not supervise the siding jobs in the true sense of the word. Representatives from Home Design or one of the salespersons would visit the job site and check the progress and any problems the siding installers were encountering. Such conduct is typical of any general contractor or architect, not just a job foreman. If there were problems or if a significant amount of additional materials were needed, the siding installers would call Home Design or the salesperson for assistance. Any leads which came to the attention of the installer at an installation site were to be turned over to Home Design. Home Design required a sign advertising its business be erected on the site while the work was performed. No doubt, if the siding was being applied to a large, new house or apartment development, one might also observe large signs identifying the general contractor and architect for the site.

Each siding installer had to supply his own tools, which generally consisted of a metal brake, ladders, and power tools. Home Design provided no transportation to the various job sites. The siding installer provided his own vehicle. On rare occasions when there was a truck breakdown, Home Design might loan a truck to the siding installer. Home Design also occasionally paid the siding installers advances and their hotel expenses. There was also testimony that

Home Design wanted the siding installers to have liability insurance and workers compensation insurance, but if they did not, then the subcontractors could be added to Home Design's policies for a fee.

In sum, the siding installers were free to set their own hours so long as the job was completed within a reasonable time frame (with only the minimal requirement that they should be there at a decent time, in decent clothes, and put in a day's work). The siding installers were paid by the job and were free to turn down work, work for other siding companies, or negotiate for better deals, and some of the more sophisticated and experienced siding installers did so. Home Design provided no equipment or training. It is true that the siding installers were given certain general instructions, but it appears they were not subject to the control of Home Design in any meaningful sense other than as to results.

An important factor was that there was no continuity in the relationship between Home Design and the siding installers. True, the reliable ones frequently received repeat business, but that is true with any prudent business which might wish to deal with reliable suppliers, middlemen, or subcontractors. The siding installers had the right to refuse to accept a relationship or an assignment from Home Design as they desired. On the other hand, once a job was completed, there was no requirement that Home Design had to offer them a further relationship or assignment.

KDHR places great emphasis on the fact that some of the siding installers were poorly educated, had old equipment, and did little, if any, advertising other than by word of mouth. The inference is that such workers are more apt to be employees than independent contractors. This is not the test. KDHR's point is not well made.

Both the agency and the district court's decisions are carefully couched in terms of credibility of witnesses. As previously noted, we do not reweigh evidence or substitute our judgment for that of the agency on factual issues. However, even allowing that all the findings of fact made by the hearing officer are correct, it simply does not appear that Home Design had the right to control the siding installers to the extent necessary to make them employees.

Home Design's business is such that it performs its services through either employees or independent contractors. Taking all of the above factors into consideration and examining the record as a whole, we hold there was not substantial competent evidence to support the agency's findings that the siding installers were employees of Home Design. The siding installers are independent contractors, and the agency's findings in this regard are reversed.

## The General Construction Workers

We are satisfied that the record contains ample evidence to support the agency's findings that the general construction workers were employees of Home Design and not independent contractors. The agency's decision in this regard is affirmed.

## Randy Edwards

KDHR concludes that because Randy Edwards, an independent sales contractor, and Henry testified that Edwards acted as Home Design's agent and because a principal has control over an agent, Edwards is thus controlled by Home Design and is an employee as a matter of law. This is a troubling conclusion to us. Taken to its logical conclusion, KDHR's findings mean that every agent acting on behalf of his or her principal would automatically be an employee.

While our research has not revealed any Kansas case law on point, we do not believe this is the law. In *Sanders v. Rowan*, 61 Md. App. 40, 484 A.2d 1023 (1984), the Maryland Court of Special Appeals, in the context of a negligence action said:

"[T]he principal/agent relationship is a generic one—a genus, of which the master/servant relationship is a species. Thus, while all masters are principals and all servants are agents, there are some principals who are not masters and some agents who are not servants. Agents who are not servants are regarded as independent contractors." 61 Md. App. at 50.

"If the principal 'controls or has the right to control the physical conduct of the other in the performance of the service,' the relationship is that of master/servant. [Citations omitted.] If there is not that degree of control or right of control, the agent is not a servant, but an independent contractor." 61 Md. App. at 51.

*See also AT&T Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1435 (3d Cir. 1994), *cert. denied* 514 U.S. 1103 (1995)

(if employer assumes the right to control the time, manner, and method of accomplishing the work, versus the right merely to require certain definite results in conformity with a contract, a master/servant relationship exists).

Thus, the existence of an agency relationship itself adds very little, if anything, to the traditional test. The right of control is still the measuring stick. From the facts presented it does not appear that Edwards was Home Design's employee. There was virtually no evidence that Home Design had any control over how Edwards accomplished his job. In fact, most of the facts relied on by KDHR are based on the amount of control Edwards had over the siding subcontractors. The test is not how much control Edwards had, but how much control Home Design had over Edwards.

One indicia of control was that Home Design had to approve any contract entered into on its behalf by Edwards. We do not believe this is substantial evidence of the existence of an employer/employee relationship.

In sum, the hearing officer's finding that since Edwards was an agent, then as a matter of law he was an employee, is an erroneous interpretation of agency/employment law. Additionally, the factual evidence relied upon by the agency to determine that Edwards was an employee is not substantial when viewed in light of the record as a whole.

We affirm the agency decision as to the general construction workers, and reverse as to the siding subcontractors and Randy Edwards.

Affirmed in part and reversed in part.