NOT DESIGNATED FOR PUBLICATION

No. 117,258

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

AMY'S SPA SERVICES LLC,
*Appellant*,

v.

KANSAS DEPARTMENT OF LABOR,
*Appellee*.

MEMORANDUM OPINION

Appeal from Johnson District Court; KEVIN P. MORIARTY, judge. Opinion filed January 26, 2018. Affirmed.

*Kevin J. Odrowski*, of Kansas City, Missouri, for appellant.

*Justin McFarland*, special assistant attorney general and deputy general counsel, of Kansas Department of Labor, for appellee.

Before HILL, P.J., MALONE, J., and MERLIN G. WHEELER, District Judge, assigned.

PER CURIAM: In this review of an agency action, Amy's Spa Services, LLC (dba Amy's Spa) asks us to overturn the Kansas Department of Labor's determination that the nail technicians who work at Amy's Spa are employees and not independent contractors. Our review of the record reveals that the Department did not misinterpret or misapply the law; there is substantial evidence supporting the agency's findings; and the Department's conclusion that these nail technicians are controlled by the Spa to such an extent that they must be legally considered to be employees was neither arbitrary nor capricious. Accordingly, we affirm.

1

We begin with a review of the facts found in the agency record. After that, we detail our scope of review and examine the law concerning employment security and where we find the test used to determine if an employment relationship exists—the right to control. After that, we analyze, in detail, the arguments made by the Spa. Then, we look at the evidence both supporting and not supporting the Department's findings. At the end, we conclude by finding the Department's actions are not arbitrary or capricious.

*We review the agency record.*

Leander and Hongmin (known as Amy) Fisher started Amy's Spa Services, LLC in 2013. Then they began doing business as Amy's Spa in early 2014. After the Spa opened, the Kansas Department of Labor conducted an audit of the business to determine the correct legal classification of the technicians working at the Spa. The auditor reviewed the Spa's independent contractor agreement signed by each technician, interviewed three nail technicians, and interviewed Leander Fisher. The auditor also reviewed some of the Spa's financial documents and tried to visit the salon—but it was closed at the time.

Each nail technician must sign a contract before working at the Spa and we find several of its provisions pertinent to our inquiries. It expressly states that the intent of the parties is to form an independent contractor relationship between the Spa and technician, not an employee/employer relationship. The workers are expected to clean their workstations but are not required to perform any janitorial duties. Each worker is to supply all tools necessary to complete the job. The technicians may set their own prices for their services, but their charges may not undercut the Spa's prices.

The contract details how customer payments are handled. Through a system controlled by the Spa, it collects all of the money and the technicians are paid a percentage of the amount each customer pays for the services received. The contract also

2

provides that the workers are free to advertise their business; however, any advertisement must conspicuously identify Amy's Spa. Either party to the contract is allowed to terminate the agreement with 21 days of notice. The workers are subject to a noncompete clause which prevents them from performing any spa, salon, nail, or beauty service within a 6-mile radius of the Spa. Additionally, the workers may not assign the contract to anyone without the written consent of the Spa.

Also under the contract, the workers are required to keep confidential any trade secrets, intellectual property, and contact lists generated at the Spa. These are the property of the Spa. The contract states that the workers are responsible for scheduling their own appointments and may come and go as they please. There is no uniform required; however, professional dress consistent with the standards of the profession is required. The workers may employ assistants as needed to accomplish the tasks under the contract. The workers are also responsible for all expenses incurred through the performance of the agreement. We move now to what was gleaned from the interviews.

The three interviewed nail technicians provided information that is important to this determination. First, Soukhalith Kongkindavong stated that she was given instructions on how to clean her workstation. She also stated that she is required to be present from 10 a.m. to 7 p.m. on the days she was working. Kongkindavong was not able to determine the days that she was scheduled to work. She went on to state that both she and the Spa scheduled client appointments, and she also provided nail services for walk-in customers. Kongkindavong was unsure whether she could work at another salon during her employment. She does not advertise her services. Kongkindavong also stated that the Spa requested she give notice if she were to stop working for the Spa. Kongkindavong brought in her own tools to perform her work at the Spa.

In the second interview, Li Tingting stated the only training she received from the Spa concerned disinfecting. Tingting stated that she did not have the ability to hire

assistants. Tingting stated she was able to work at other nail salons, but she is currently only working for the Spa. She has a set schedule, but she could be discharged from or leave the Spa without any penalty. She is paid a commission and keeps track of the number of nail services performed in a day. She does bring some of her own supplies, but the Spa provides the desks where services are performed and all of the nail polishes. There is no desk or booth rental fee.

In the third interview, Judith Rada stated that she was required to attend mandatory meetings and was given instructions on how to clean her work area by the Spa. Apparently, no follow-up investigation was done on the nature of the mandatory meetings. Rada would come to the spa at 10 a.m. each day as scheduled by the Spa. Rada stated that she could not work for more than one salon at a time due to the hours required at the Spa. Rada had also been called on her days off to see about her availability to work when someone called in sick. Rada provided some supplies to perform the services, like clippers, nippers, and a cuticle pusher, and the Spa provided the disinfectant, polish, and chairs. One time Rada brought in her own polish for a customer, and one of the owners of the Spa became very upset and took it away from her. Based upon the information gathered from the audit, the auditor concluded that there was an employer/employee relationship between the Spa and the nail technicians.

Unsatisfied with the auditor's conclusion, the Spa pursued its administrative remedies. First, it sought a review of this determination through the Department. Joe Vining, Chief of Contributions for the Department, found the Spa had presented insufficient evidence to reverse the auditor's decision. Vining analyzed whether the Spa had the right to control the work being performed and whether control was being exercised. Vining relied upon the nail technicians essentially not running their own business as one factor in determining whether an employer/employee relationship was present. Additionally, the Spa set the prices for services on its website, and while the technicians could set their own prices, Vining concluded that customers would expect to

4

pay the prices advertised by the Spa. The expectation of prices, coupled with the single payment system, led to the conclusion that an employer/employee relationship existed.

After that ruling, the Spa appealed this decision to the Kansas Secretary of Labor, where a hearing officer took evidence on the matter. The auditor, Vining, and Leander Fisher all testified at that administrative hearing. We offer some details.

The auditor described the procedure she used to conduct the audit. She stated that in forming her opinion she must take what is said in the interviews as true. Nothing in the independent contractor agreement swayed her opinion over the ultimate question. Further, she stated what was said in the interviews did not contradict anything in the independent contractor agreement. Concerning the worksheet and her notes, the auditor testified that she prepared the worksheets on the same day the interviews occurred. The worksheets contained all of the information from the interviews. After completing the worksheets, she discarded her interview notes.

Vining's testimony concerned his review of the Spa's appeal from the auditor's determination. He admitted that the information about the customers' expectations of prices was an assumption from the auditor's report.

Leander Fisher told the court that the Spa followed the requirements of the independent contractor agreement. He discussed the payment allocations and stated the nail technicians keep all of the tips they receive. The technicians are free to set their own hours and discussed various situations that could occur as a result of them setting their own hours. The technicians did not receive training because they were already trained and licensed as cosmetologists. He also detailed other work the technicians performed outside of their work with the Spa. It included working in an alteration shop, working as a maid, and working at a different nail salon in Lawrence, Kansas.

5

The hearing officer ultimately determined that the Spa had the right to control the end result and the manner of work for the technicians at the salon. To reach this conclusion, the hearing officer used the two statutory tests set out in K.S.A. 2016 Supp. 44-768. First, the hearing officer concluded there was no reasonable basis for the Spa to believe it properly classified the workers under all of the circumstances in K.S.A. 2016 Supp. 44-768(a). Second, the hearing officer assessed the eight factors set out by K.S.A. 2016 Supp. 44-768(b) to determine whether the Spa had the right to exercise control over the workers. The factors are:

"(1) Must the individual comply with specific instructions from the business regarding when, where, and how to perform services so provided?

"(2) Are the activities of the individual integrated into the ongoing operations of the business?

"(3) If needed to accomplish the desired end result, does the individual have the responsibility to hire, supervise and pay assistants?

"(4) Must the individual work exclusively for the business in question?

"(5) Is payment by the business to the individual for services contingent on completion of established benchmarks or tasks?

"(6) Does the individual provide significant tools, materials or other equipment used in the accomplishment of the desired end result?

"(7) Is the individual responsible for any expenses incurred in the performance of services?

"(8) Can the individual suffer a loss in the course of performing services?"
K.S.A. 2016 Supp. 44-768(b).

The hearing officer then applied the facts presented to the statutory factors.

- Factor 1 could indicate either type of relationship, but the hearing officer also noted that the customers to be served were customers of the salon based upon the language of the agreement.

6

- Factor 2 indicates that the services were necessarily a key part of the business of the Spa, indicating employment.

- Factor 3 favored the Spa having control because while the agreement stated that the workers may hire assistants, this was incompatible with the no-assignment clause of the contract.

- Factor 4 favored employment status because even though the workers were able to perform work for others, the noncompete clause limited the geographical area in which the workers could perform work. In the hearing officer's opinion, "[i]t is difficult to imagine that a true independent contract with his or her own business . . . should be restricted by a contract clause limiting the contractor's ability to contract with others desiring to purchase their services within some such geographically-constrained area."

- The hearing officer was not clear on how factor 5 applies, but he noted that payments to the workers from the Spa were contingent upon the completion of services to the satisfaction of the Spa's customers.

- Factor 6 favored employment because the Spa handled the customers' payments even though the workers provided their own tools while the Spa provided the facility, chairs, and some supplies like nail polish.

- Factor 7 supported independent contractor status because the workers are responsible for the costs of maintenance and upkeep of their tools.

- Factor 8 supported employment status because the workers did not pay booth rental fees or incur expenses other than the maintenance of their tools; conversely, the Spa incurred risks regarding customers' payments.

The hearing officer weighed the facts and, based upon all the circumstances presented, found five of the statutory factors revealed that the workers were subject to the control of the Spa.

7

In support of the conclusion that the workers were actually employees and not independent contractors, the hearing officer wrote convincingly of the nail technicians' work as the reason for the spa's existence:

"An important factor supporting this conclusion is that the nail technicians' work efforts are completely integrated into [the Spa] as a manicure/pedicure salon. This relates directly to [the Spa's] very rationale for existence as a nail salon. The work performed is a key aspect and part of [the Spa's] regular business. This level of integration, along with the other factors indicating that the nail technician[s'] work is subject to control by the business with regard both to the end result of the work performed as well as the manner and means by which those results are accomplished, support the Contributions Unit's determination that the nail technicians constituted employees."

The Spa then appealed the Department's decision to the district court under the Kansas Judicial Review Act, K.S.A. 77-601 et seq. The district court reviewed the entire certified record and upheld the Department's decision after it concluded that it was supported by sufficient evidence and was not arbitrary or capricious. The Spa now seeks our review.

To us, the Spa contends the Department misapplied the law, did not have substantial evidence supporting its conclusions, and made an arbitrary and capricious decision. The Spa challenges the Department's determination that there is an employer/employee relationship, thus requiring the Spa to withhold unemployment tax for its workers.

*We first review the law of judicial review of agency actions.*

This appeal from the district court is also a determination under the Kansas Judicial Review Act. According to K.S.A. 2016 Supp. 77-603(a), we are not bound by any determination of the district court in this matter. Indeed, we exercise the same limited

review as the district court. We conduct this review as if the action was originally brought before this court under the Act. *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 567, 232 P.3d 856 (2016).

Also, according to the Act, when we review claims of error we may only grant relief if one or more statutory errors are present. K.S.A. 2016 Supp. 77-621(c)(1)-(8). The Spa argues three of the statutory errors are present here:

- The Department erroneously interpreted or applied the law;
- the Department's determination is not supported by substantial evidence; and
- the Department's decision is unreasonable, arbitrary, or capricious. See K.S.A. 2016 Supp. 77-621(c)(4) and (7)-(8).

The party asserting that the Department erred has the burden of proving the error. See K.S.A. 2016 Supp. 77-621(a)(1).

*The employment relationship in Kansas is determined by the right to control.*

The Department was legally obliged to determine if these nail technicians were employees or independent contractors and the Kansas Employment Security Law, K.S.A. 44-701 et seq., governs this determination. For our purposes, "employment" under this law is defined in K.S.A. 2016 Supp. 44-703(i)(3)(B) to include "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee subject to the provisions of subsection (i)(3)(D)." That subsection speaks of control of the manner and means of activities:

> "Services performed by an individual for wages or under any contract of hire shall be deemed to be employment subject to this act if the business for which activities

9

of the individual are performed retains not only the right to control the end result of the activities performed, but the manner and means by which the end result is accomplished." K.S.A. 2016 Supp. 44-703(i)(3)(D).

This definition of employment is at times called the common-law right to control test. The right to control test is the proper test in determining whether a person is an employee or independent contractor under Kansas law. *Hartford Underwriters Ins. Co. v. Kansas Dept. of Human Resources*, 272 Kan. 265, 270, 32 P.3d 1146 (2001).

The Spa argues the district court did not correctly interpret or apply the law because it did not address a 20-factor test some courts have used to determine whether an employer/employee relationship is present. See *Craig v. FedEx Ground Package System, Inc.*, 300 Kan. 788, 797-98, 335 P.3d 66 (2014). In our view, the Spa gives too much weight to the 20-factor test in *FedEx* because the holding in *FedEx* applies only to determinations under the Kansas Wage Payment Act and not to the Employment Security Act which is applicable here. See 300 Kan. at 798.

Importantly, in this case application of the right to control test is controlled by a specific statute—K.S.A. 2016 Supp. 44-768. It states: "The secretary shall make the determination of employment required by K.S.A. 44-703(i)(3)(D), and amendments thereto, by examining the totality of the circumstances in which the individual renders service and shall exercise strict impartiality in the conduct of any such determination."

The statute requires the Department to first determine if the business had a reasonable basis for the business classification of the workers. K.S.A. 2016 Supp. 44-768(a). The Department made that determination here, and it is not challenged by the Spa. If the Department determines there is not a reasonable basis for the business classification, then the statute lists eight factors that the Department must consider in making its determination of whether a worker meets the definition of an employee.

10

K.S.A. 2016 Supp. 44-768(b)(1)-(8). The Department here followed the law that the Legislature directed it to follow.

Thus, the 20-factor test in *FedEx* is not applicable for the Department's analysis under the statute here. The Legislature directs the Department to consider the eight factors in K.S.A. 2016 Supp. 44-768(b) when making determinations of whether a person is an employee under the Kansas Employment Security Act. Thus, the Department did not erroneously interpret the statute by applying the factors the Legislature has directed it to consider.

Although its argument is not entirely clear, the Spa seems to argue the Department erred by incorrectly applying the law based upon established caselaw. The Spa has the burden of proving to this court the Department misapplied the law. See K.S.A. 2016 Supp. 77-621(a)(1).

In this argument, the Spa cites *Caring Hearts Personal Home Services v. Hobley*, 35 Kan. App. 2d 345, 130 P.3d 1215 (2006), for the propositions that the existence of a noncompete clause and a single entity handling the billing shows an independent contractor relationship. However, *Caring Hearts* involved two independent contractors contesting the viability of a noncompete clause. There was no issue whether the workers were employees or independent contractors. At the most, *Caring Hearts* shows that an independent contractor can be subject to a noncompete clause. See 35 Kan. App. 2d at 355.

We hold *Caring Hearts* is not beneficial to our analysis here, simply because noncompete clauses can exist in contracts for both employees and independent contractors. See, e.g., *Allen, Gibbs & Houlik v. Ristow*, 32 Kan. App. 2d 1051, Syl. ¶ 2, 94 P.3d 724 (2004). The Spa has not shown how the Department misapplied the law because *Caring Hearts* does not stand for the proposition that the Spa claims it does.

11

Turning to the issue of control, the caselaw the Spa cites is simply not persuasive. In *Milano's Inc. v. Kansas Dept. of Labor*, 296 Kan. 497, 504, 293 P.3d 707 (2013), the court found that exotic dancers were employees because there was a clear exercise of control. The court relied upon the owners setting various rules and if the dancers violated the rules they would be punished by the business. 296 Kan. at 504. This case provides very little help for us here. *Milano's* does not represent the benchmark of what constitutes control—instead, it was a clear case of where control was present. The Department's decision was not a misapplication of the law simply because the level of control demonstrated in *Milano's* was not also present in the record here.

The Spa also relies on *McDonnell v. The Music Stand, Inc.*, 20 Kan. App. 2d 287, 886 P.2d 895 (1994), to show the Department misapplied the law. The Spa compares the facts of *McDonnell* to the present case to show there is no right of control in the present case. In *McDonnel*, a worker was an independent contractor when he received a flat fee for repossession of instruments and a contingent fee on payments made after collection of the debt had begun. This arrangement was for only one year and could be ended by either party with 30 days' notice. While *McDonnell* has some factual similarities, it is distinguishable from the present case. The worker in *McDonnell* was essentially a collection agent for a company which sold music equipment. The collection agent provided his own business as a service to the seller of music equipment. The workers here provide an integral portion of the Spa's business and provide the services to customers of the Spa. The lack of integration distinguishes the facts here from *McDonnell*; thus, the case does not show the Department misapplied the law.

Thus, *Caring Hearts*, *Milano's*, and *McDonnell* are either unhelpful or unpersuasive. Based upon our review of caselaw cited by the Spa, it has failed to meet its burden of showing the Department erred in either interpreting or applying the law.

12

*Substantial evidence supports the Department's conclusions.*

When reviewing whether substantial evidence supports an agency decision, the courts must determine if the evidence is substantial in light of the record as a whole. K.S.A. 2016 Supp. 77-621(c)(7). The phrase "in light of the record as a whole" is further defined by statute, and it means we look at all of the evidence without reweighing it:

> "[T]he adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such findings as well as all the relevant evidence in the record . . . cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review." K.S.A. 2016 Supp. 77-621(d).

To make a determination of whether substantial evidence supports an agency's determination we must take three steps:

- review the evidence both supporting and conflicting with the agency's determination;

- examine the presiding officer's credibility determinations; and

- review the explanations why the evidence supports the agency's decision. *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014).

The Spa first contends that the information from the audit is completely lacking credibility and should not be considered at all. This contention is based in large part on the district court's determination that the investigation was inadequate and there were discrepancies within the auditor's testimony. Indeed, the record does show an incomplete investigation and there were discrepancies in the auditor's testimony.

13

We illustrate our point. The auditor stated that she must believe everything the workers told her in the interviews, that she had to make her determination of what was said to her in the interviews, and assess all of the relevant factors. But the statute requires the Department to consider all of the circumstances in making its determination, not just the nail technicians' statements. See K.S.A. 2016 Supp. 44-768(a). Furthermore, the auditor stated that nothing in the workers' statements was contradictory to the provisions of the independent contractor agreement. This is clearly not true because there are several inconsistencies and contradictions between the terms of the agreement and the workers' statements. For example, the workers all stated they had a fixed work schedule, but the agreement states there is no fixed schedule and the workers may come and go as they please. To determine the workers' status all of the circumstances must be considered; thus, the independent contractor agreement and the workers' statements are relevant to the inquiry. The auditor's testimony shows a disregard for the statutory requirements, so her conclusions and opinions will not be considered in our analysis of whether the Department had substantial evidence to support its determination.

The Spa also contends that the information contained in the worksheets created by the auditor should not be considered as relevant evidence due to the auditor's lack of credibility. In an agency hearing, hearsay evidence is not excludable solely on the grounds that it is hearsay evidence. K.S.A. 77-524(a). While the worksheets partially contain the auditor's opinion, the workers' statements found within the worksheets provide relevant evidence to determine the issue at hand. Because the worksheets contained all of the information from the interviews, the worksheets are sufficiently credible to be considered by the Department in making its determination.

Turning to whether substantial evidence is present, we must consider both the evidence which supports the Department's decision and the evidence which detracts from the Department's decision. There is no error if in light of the whole record the Department had substantial evidence to support its decision. "'Substantial evidence is

14

evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issue can reasonably be resolved' [Citations omitted.]" *Bd. of Cherokee County Comm'rs v. Kansas Racing & Gaming Comm'n*, 306 Kan. 298, 326, 393 P.3d 601 (2017). This determination requires the court to look at the Department's explanation of why the facts support the decision. See *Petromark*, 299 Kan. at 795. We now review the eight factors listed in the law.

The *first factor* is whether the individual must comply with specific instructions from the business regarding when, where, and how to perform the services. K.S.A. 2016 Supp. 44-768(b)(1). Here, there is conflicting evidence. The workers, through their statements, clearly indicated that the Spa directed when they had to perform services because they had set schedules. In contrast, the independent contractor agreement stated that the workers do not have a set schedule. Leander Fisher testified that he operates the business consistently with the independent contractor agreement concerning scheduling and the workers were free to come and go as they pleased. The facts for this factor could indicate the workers are employees or independent contractors. The Department identified the potential for this factor could weigh either way and it is not clear if it weighed this factor towards either employment or independent contractor status.

The *second factor* is whether the activities are integrated into the ongoing operations of the business. The workers are clearly integrated into the ongoing operations of the business because they provide essential services of the Spa. The contract says that the workers are to provide salon-type services to the Spa's customers. The Spa concedes that this factor supports employment. There is substantial evidence for the Department's determination on this factor.

The *third factor* asks whether the worker has the responsibility to hire, supervise, and pay assistants. The Department found that the workers would have this responsibility under the contract; however, due to the no-assignment clause of the contract, the Spa had

15

the ability to exercise control. On appeal, the Spa argues that this is an unreasonable conclusion because the nature of the services provided.

Due to Kansas' statutes controlling the practice of cosmetology and related services, a person providing the services under the terms of this contract must be licensed to perform the services. See K.S.A. 2016 Supp. 65-1902(a)(1). However, the license requirement does not necessarily mean the duties under the contract would not be assignable. Rather, if the workers wished to assign their duties under the contract, they would simply have to assign those duties to a licensed technician.

Under the no-assignment clause of the contract, the workers cannot assign their duties under the contract to a different licensed technician without first obtaining written consent from the Spa. To a degree, this shows the Spa has the authority to exercise control over the way the workers perform their duties under the contract. The specific worker that signed the contract must perform the work under the terms of the contract, unless the Spa permits the worker to assign the contract to another licensed cosmetologist. In other words, the Spa has the authority to exercise control over the services being provided.

The *fourth factor* is whether the worker must perform services exclusively for the business. Evidence supports a conclusion either way. The workers may, and in some cases did, perform work for businesses other than the Spa. This indicates independent contractor status. However, the Department found the noncompete clause showed that this factor favored employment. The Department reasoned that a true independent contractor arrangement would not restrict the independent contractor's ability to work within a geographically constrained area. Here, the noncompete clause prohibits the workers from performing any salon service in competition with the Spa within a 6-mile radius of the Spa. The language of the contract provides factual support for the Department's conclusion and rationale.

16

The *fifth factor* analyzes whether payment by the business is contingent upon the completion of established benchmark tasks. The Department found that payment was contingent on completion of services for the Spa's customers based on the language of the contract. It is unclear how the Department applied this factor.

The *sixth factor* asks whether the worker provides significant tools, materials, or other equipment to accomplish the task. The Department found the workers provided certain portable tools that are needed to provide services, but the salon provided the facility itself, the chairs, tables, and supplies. The record supports this factual finding. The Department found this factor favored employment because the Spa provided the cleaning supplies, polish, and payment processing system. This rationale and application of this factor is not supported by the evidence because the fact that the workers provide the hand tools to perform the contract clearly shows this factor favors independent contractor status.

The *seventh factor* is whether the worker is responsible for any expenses incurred in performing the services. The Department found that the workers are responsible for the upkeep on their tools; thus, this factor suggests independent contractor status. The record clearly shows the workers pay for the upkeep of their tools.

The *eighth factor* is whether the workers can suffer a loss in the course of performing services. The Department found that the workers do not pay a booth rental fee or incur substantial expenses beyond the portable tools they utilize to perform their services. Further, the Department found the salon incurs the risk of loss from processing the payments from customers. Leander Fisher stated in his interview that the workers do not pay any rental fee to the Spa. The contract provides that the Spa bears the risk of processing customers' payments. The Department had substantial evidence to support this conclusion.

17

Conversely, the Spa argues the workers can suffer loss because they are open to personal liability for any harm they cause in the performance of services. The Spa relies upon *Steele v. Rapp*, 183 Kan. 371, 327 P.2d 1053 (1958), to show that nail technicians face potential liability from their work. This case is not persuasive. First, this case involved a question of whether the actions of a salon worker were an independent cause that would have broken the link of causation for a beauty supplier's tort liability, so it is not applicable to the present facts. Second, the Spa ignores the fact that the pleadings in the underlying case claimed the salon worker was an employee of the salon. *Steele* does not provide support that the workers here were independent contractors because they face liability.

Here, the workers' potential liability is outlined within the contract; however, it is unclear how the potential liability would sway this factor to independent contractor status. Being an employee of a business does not absolve a person from liability for tortious conduct. In *Kerns v. G.A.C., Inc.*, 255 Kan. 264, 274, 875 P.2d 949 (1994), the court held that "officers, agents, and employees of a corporation who violate a duty owed to third persons are liable to such persons for their torts." The existence of the possibility of liability on behalf of the workers does not invalidate whether there is substantial evidence to support the Department's conclusion.

Not directly addressed in the Department's reasoning, but relevant to the inquiry, is the contract provision that requires the Spa to be conspicuously identified on any of the workers' personal advertisements. This evidence is contained within the independent contractor agreement and is relevant to the question of whether the Spa has the right to control the means and performance of services.

The Spa argues the advertising clause does not show that it exercises control over its workers. The Spa cites three cases to support its position. The Spa argues in *Home Design, Inc. v. Kansas Dept. of Human Resources*, 27 Kan. App. 2d 242, 2 P.3d 789

18

(2000), the appellate court did not find a contractual requirement that a subcontractor advertise the general contractor's business constituted control over the subcontractor. This is an overly broad reading of the case. While the court did address the advertising requirement, it was of little use in the actual determination. The case was decided on the basis of other facts. The advertising was merely mentioned in the context of "if the siding was being applied to a large, new house or apartment development, one might also observe large signs identifying the general contractor and architect for the site." 27 Kan. App. 2d at 246.

Compared to the facts of this case, if someone were to receive a business card that advertised both a nail technician and the Spa, one would expect the nail technician to be an employee of the Spa. The advertising requirement shows that the Spa is exercising a right to control the services the workers are performing because it involves the workers' personal advertising for their business. The contract here provides a very different restriction than the general contractor advertising that was addressed in *Home Designs*.

Next, the Spa relies upon *Hendrix v. Phillips Petroleum Co.*, 203 Kan. 140, 453 P.2d 486 (1969). The ruling in *Hendrix* is not controlling on the analysis in this case. The case states that "'the mere fact of ownership of property or that goods marketed under the trade name of such owner are advertised and sold there is insufficient to show that the one who sells the goods is the agent or employee of such owner.' [Citations omitted.]" 203 Kan. at 155. At most, *Hendrix* stands for the proposition that an advertising agreement alone is an insufficient basis to show employment. But this was a minor point in the case. The case was decided based upon the independent contractor negligently acting outside the scope of the work he was to do for the business. 203 Kan. at 156-57. Here, the advertising is only a factor that supports an employer/employee relationship, and not the entire basis for the determination that the workers are employees. Thus, *Hendrix* only provides minimal persuasive value.

19

The Spa also cites *Martin v. Wichita Cab Co.*, 161 Kan. 510, 170 P.2d 147 (1946), stating it reached an identical result as *Hendrix*. *Martin* is not applicable because it is distinguishable on the facts. The determination of independent contractor status was not based upon a requirement to advertise; rather, the drivers were independent contractors because they leased the vehicles from the company. While the cabs they leased contained advertising, it was clear the cab drivers were operating their own business. 161 Kan. at 517-18.

Based upon the facts that support employment status and the evidence that detracts from employment status, the Department clearly had relevant evidence which could lead a reasonable person to conclude that the Spa had the right to exercise control over the workers. The no-assignment clause, the advertising clause, the workers' statements about having a fixed schedule, the noncompete clause, the process of how the money is handled, and the integration of the workers into the Spa's business provide a sufficient factual basis for the Department to reach its conclusion. The question now turns to whether the Department's determination was unreasonable, arbitrary, or capricious.

*This decision is neither arbitrary nor capricious.*

The Kansas Supreme Court has held that an agency action is unreasonable when it is taken without regard to the benefit or harm to all interested parties or is without foundation in fact. Further, an agency action is arbitrary and capricious if it is unreasonable or lacks any factual basis. *Sunflower Racing, Inc. v. Board of Wyandotte County Comm'rs*, 256 Kan. 426, 431, 885 P.2d 1233 (1994). The test for an unreasonable, arbitrary, or capricious agency action essentially looks at whether the agency reasonably exercised its discretion in reaching the decision based upon the agency's factual findings and the applicable law. 256 Kan. at 445.

20

Questions for us to consider in making this determination are whether the agency acted reasonably:

- Did the agency rely on factors that the Legislature had not intended it to consider?
- Did the agency fail to consider an important aspect of the problem?
- Did the agency's explanation of its action run counter to the evidence before it? And
- Was the agency's explanation so implausible that it could not be considered simply a difference in view or the result of agency expertise? *Wheatland Electric Cooperative v. Polansky*, 46 Kan. App. 2d 746, 757, 265 P.3d 1194 (2011); see *Motor Vehicle Mfrs. Assn. v. State Farm Mut.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983).

First, the Department did not rely upon factors that the Legislature did not intend for it to rely upon. In fact, the Department relied upon the eight factors the Legislature requires it to analyze in making determinations of the workers' status. K.S.A. 2016 Supp. 44-768(b). As discussed above, the Department's use of these factors is the proper procedure to use under the statute. This shows the decision was not unreasonable, arbitrary, or capricious.

Second, the Department did not fail to consider an important aspect of the problem. The Spa argues the Department reached the incorrect result. Outside of the contention that the Department applied the incorrect test, which is discussed and rejected above, there is no contention that the Department failed to consider important aspects of the problem. The Department considered the right to control test based upon all of the circumstances in the light of the eight-factor test that it was required to do by statute. This factor favors a conclusion that the Department determination was proper.

21

Third, the Department's determination does not run counter to the evidence before it. As we stated earlier, the Department had substantial evidence for its conclusion. Because substantial evidence supports the Department's determination, this factor favors a conclusion that the determination was proper.

Finally, the Department's explanation was not implausible. The evidence here does not provide a clear answer to whether the workers are employees or independent contractors. Facts exist that could support either conclusion. While there may be a difference of opinion concerning the status of the workers, the Department is vested with the discretion to make this determination. This court will not substitute our opinion for the Department's determination. *Coonce v. Garner*, 38 Kan. App. 2d 523, 531, 167 P.3d 801 (2007).

Ultimately, the Department's decision was reasonable. The integration of the workers into the Spa's business, the testimony that the workers had a set schedule, all money was first collected by the Spa and then given to the workers, the noncompete clause, the no-assignment clause, and the advertising clause could lead a reasonable person to conclude that the Spa had the right to exercise control over the means and end of the services being performed. The Legislature has given the authority for the Department to make the determination concerning the status of workers. The Spa has not met its burden of showing the Department's decision was unreasonable, arbitrary, or capricious.

Affirmed.